334 So.2d 788 (1976)
Ann Mitchell, wife of/and Ryan F. UHLICH
v.
MEDALLION REALTY, INC., et al.
No. 7246.
Court of Appeal of Louisiana, Fourth Circuit.
May 28, 1976.
Rehearing Denied July 29, 1976.
*789 Louis R. Koerner, Jr., Koerner & Babst, New Orleans, for plaintiffs-appellants.
Lucas J. Giordano, Mmahat, Gagliano, Duffy & Giordano, Metairie, Bernard J. Capella, New Orleans, for defendants-appellees.
Before REDMANN, MORIAL and BEER, JJ.
REDMANN, Judge.
This case depends heavily on its multifaceted facts. Our trial brother's evaluation of those facts is apparently not different from ours. But he ruled, in effect, that a real estate broker has no legal obligation to would-be purchasers for whom he agreed to look for a vacant lot abutting a levee in a specified location, not even when representing to them that he has found such a lot for them. What occurred was that, after agreeing to look for such a lot for plaintiffs, the agent found one and obtained an agreement to sell it for $11,300 (roughly the then market value) to a longtime friend who dabbled in real estate. The agent then immediately persuaded plaintiffs to pay $14,800 for it. The agent did not reveal (but misrepresented, testify plaintiffs and a disinterested third party) the circumstances. Plaintiffs learned at their act of sale (making plaintiff husband look "distraught," the notary thrice testified) that their vendor had acquired the lot that very day. Believing themselves victimized, they sued the agent and his employer for the difference between the $11,300 and $14,800 prices, for incidental expenses, and for damages for mental anguish. The trial judge dismissed the suit, reasoning that plaintiffs "have a rather strict failed to carry that burden. Plaintiffs appeal. We reverse.

Facts
Plaintiff husband and wife in 1971 wanted a vacant lot abutting Lake Pontchartrain's *790 levee. The wife first found such lots on a map of the then-undeveloped Palm Vista subdivision at Kenner. She found herself unable to reach the lots by automobile; "the [drainage] canal [was] as far as I could go." Looking then in newspaper classified advertisements, she found and responded by telephone to defendant Medallion Realty's advertising of certain Palm Vista lots. Dunbar Laplace of Medallion informed her that those lots were not levee lots, but he said he would look for a levee lot for her, although they were "scarce." On October 30, 1971, plaintiffs met with Laplace at Medallion to reassert their willingness and ability to buy a levee lot, and to ask Laplace and Medallion to find a lot for them.
Between March and November 1971 there were sales of nine levee lots in Palm Vista. All lots were undeveloped, 75 feet front by 142 to 148 feet deep, and all in our lot's square. Laplace himself was the real estate agent on seven of these nine earlier sales. Two lots of Laplace's seven are not precisely priceable because sold as part of a group including five non-levee lots. The individual levee lots Laplace sold included four at $10,000 each (on March 22, May 4, July 1 and August 20) and one at $10,800 the last sale being October 22, 1971, eight days before plaintiffs went to Medallion's office to confer with Laplace. There were also two sales in this period on which Laplace was apparently not an agent: on May 5 one lot sold for $11,500 and on November 4 one sold for $7,000.
On November 5, Laplace persuaded plaintiffs to offer $14,800 for their lot a lot which Laplace's friend Vincent Danna bought through Laplace at the same time, from a seller represented by a broker with 47 years of experience (though no other experience in this small subdivision), for only $11,300.[1] Thus, on November 3 when he advised plaintiffs he had found a lot for them at $14,800, and on November 5 when he advised plaintiffs to sign the $14,800 offer, Laplace knew both that he had found the lot, available from a brokerrepresented owner, for only $11,300 ($10,000 net), and also that he, Laplace, had handled four other sales at $10,000 in the previous few months and one sale at $10,800 just two weeks earlier.
(As a further indicator of the lots' market value and of the Laplace-Danna relationship, we note that on November 17 or 19 Laplace as agent procured an agreement to sell to Danna yet another levee lot in the same square for $11,000. That lot was also sold through Laplace, for $14,900, about a week later, to a Tennessee resident: the same Tennesseean whom Laplace mentioned to plaintiffs in October as another would-be purchaser for whom Laplace was looking for a levee lot.)
Interpreting the facts most favorably towards Laplace, one might conclude that Laplace had (as he and Danna testified) also been looking for Palm Vista levee lots for long-time friend Danna;[2] that, naturally enough, he preferred his *791 friend and earlier prospect by offering the lot first to Danna, who accepted, intending the lot for his own purposes; that Danna, on being informed he might make a quick profit, agreed to sell.[3] Even so, Laplace must be held to have breached his obligations towards plaintiff, and the breach to have damaged plaintiffs.
The fundamental Louisiana law is that a broker is the agent of both parties: "The broker or intermediary is he who is employed to negotiate a matter between two parties, and who, for that reason, is considered as the mandatary of both." C.C. 3016. "The obligations of a broker are similar to those of an ordinary mandatary, with this difference, that his engagement is double, and requires that he should observe the same fidelity towards all parties, and not favor one more than another." C.C. 3017. "Brokers are . . ., as other agents, answerable for fraud or faults." C.C. 3018.
We first observe that a real estate agent's agreement to "look for" a reasonably defined lot for a prospective purchaser is not a selfless gratuity. The agent works for a commission on any ultimate purchase, and the prospective purchaser who enlists the agent's professional aid impliedly promises that the agent shall be paid his usual commission if the agent finds a suitable lot which the purchaser buys. (That the custom is for the seller to pay the commission does not alter either the agent's working for commission or the "employing" purchaser's implied obligation that commission shall be paid. The custom of splitting commission when each of buyer and seller has his own agent concedes the truism that the buyer is as indispensable to the sale as is the seller.)
Thus it is error to conclude that the prospective purchaser's conditional obligation to the agent is no obligation and that therefore (for lack of cause, C.C. 1893) the agent has no obligation to the purchaser. The agent's obligation to "look" is difficult to quantify (and therefore to enforce): but it is an obligation. Our bargain was more than "if you find a lot, I will see that you are paid a commission." Our agent was asked and agreed to look for a lot. Plaintiffs had themselves been looking, knew looking was necessary, and decided upon dealing with a professional so that he would look for them; and defendants agreed to look.
More important, in reporting successful completion of his mission to look, Laplace had the obligation of good faith, C.C. 1901, and fidelity towards plaintiffs, C.C. 3017,[4] which required him to advise them that, while he had indeed found the *792 lot, he had obtained an agreement to purchase it in favor of Danna for a price approximately the same as that several similar lots had brought in recent months, and that it was Danna, the new purchaser, who was willing to sell the lot to plaintiffs, at a profit. In our judgment, a reasonably informed reasonable buyer would not have agreed to pay the extra $3,500 Danna was asking. And, had Danna kept that lot, it is more probable than not that plaintiffs instead of Danna againwould have bought the next lot that Laplace found, at only $11,000.
Laplace's failure to perform with good faith and fidelity thus deprived plaintiffs of the opportunity to await another lot  a lot that would have cost them only $11,000. We conclude, however, that plaintiffs' damage is not their cost over that $11,000 next sale, but their cost over market price. The best evidence of market is the $11,300 sale to Danna,[5] in which seller and buyer were represented by independent real estate agents. Plaintiffs' damage was thus $3,500.
Plaintiffs' demand for the incidental expenses of sale is rejected. Those costs would have been incurred in any event; they were not caused by any breach of contract.
Plaintiffs' demand for damages for mental anguish is also rejected, as not allowable for breach of contract (other than contract for "the gratification of some intellectual enjoyment," C.C. 1934(3)); Meador v. Toyota of Jefferson, Inc., La. 1976, 332 So.2d 433.
The judgment is reversed; there is judgment for plaintiffs against defendants Dunbar G. Laplace, Jr. and Medallion Realty, Inc. for $3,500 with interest from judicial demand (as prayed) and all costs.
NOTES
[1] Suggestive of the possibility that Laplace could have had plaintiffs' November 5 offer to purchase in hand before presenting to the then owner his friend Danna's offer to purchase dated November 3 but valid through November 5 is the then owner's real estate broker Hirsch's testimony. After testifying of his client's insistence on netting $10,000, and of advising Laplace of this irreducible net when Laplace "contacted" him, Hirsch was asked "Do you recall or does the record show the date upon which he first talked to you?" Hirsch answered "It would not only show but I can tell you the dates in chronological order; 3, 4, 5. On November 4, Mr. Dunbar Laplace came into my office and received the information [of requiring $10,000 net]. . . and that was the way his offer showed up the next day." [Emphasis added.] If this testimony is accurate, Laplace presented Danna's "November 3" offer to Hirsch on November 5, the same day Laplace obtained plaintiffs' offer.
[2] Laplace testified that he had been looking for a levee lot for Danna since March of 1971, when Danna declined to buy a group of seven Palm Vista lots including two at the levee. This testimony, however, is inconsistent with Laplace's having brokered agreements to sell individual levee lots on April 14, May 20 and September 7, 1971.
[3] Danna testified that he bought to use for a home but decided to sell because he learned that streets and utilities would not soon be available. This testimony is inconsistent with his purchase through Laplace of another levee lot in the same square two weeks later. Although he explained that the second lot was within the boundary of the city of Kenner (promising, he thought, faster development at that lot) Danna also sold that second lot a week later at a $3,900 profit to Laplace's prospective purchaser from Tennessee.
[4] Laplace recognized this basic obligation of good faith and fidelity when he informed plaintiffs initially that he was also looking for levee lots for other persons. A conflict of interest can arise if, e.g., an agent can find but one lot of a type for which he has two customers (or finds two at different prices); thus the disclosure to the second customer that the agent has already agreed to look for such a lot for the first customer is a most obvious obligation of the agent, a breach of which would deprive the second customer of the opportunity to choose another agent, who could act immediately in behalf of the second customer.

Such a conflict of interest is analogous to that in Latter & Blum, Inc. v. Ocean Drilling & Expl. Co., La.App.1973, 272 So.2d 53, writ refused, La., 275 So.2d 784 and Robert N. Samuels, Inc. v. Michaels, La.App.1975, 315 So.2d 63. In each of those cases a broker was refused commission because of breach of duty towards one client attributable to performance of duty towards another client.
[5] Later sales for higher prices (May 11, 1972, $16,500; February 28, 1973, $17,250; June 1, 1973, $19,000; June 22, 1973, $18,000), whatever their explanation, do not affect market value as of November, 1971.