506 So.2d 1336 (1987)
TAHOE CORPORATION, a Utah Corporation & William H. Deal, Trustee for Tahoe Corporation, Appellants,
v.
P & G GATHERING SYSTEMS, INC., Gas Transportation Corporation, William B. Brown & William H. Krutzer, Appellees.
No. 18686-CA.
Court of Appeal of Louisiana, Second Circuit.
May 6, 1987.
*1338 Shotwell, Brown & Sperry by George Wear, Jr., Monroe, and McKeithen, Wear, Ryland & Woodard by George M. Wear, Columbia, for appellants.
Brown, Wicker & Amman by Ralph J. Wicker, Monroe, for appellees.
Before HALL, SEXTON and NORRIS, JJ.
NORRIS, Judge.
This is a suit for quantum meruit or breach of the obligation to perform in good faith. The plaintiff, Tahoe Corp., claims that it continued to sell natural gas to defendant, P & G, even though P & G refused to negotiate a better price for Tahoe. To prove damages, Tahoe introduced evidence of numerous other transactions between the defendants and other sellers, as well as evidence of a federal maximum price. It argued that the relationship between the corporate defendants encouraged them to depress the price they paid to Tahoe, thereby enriching themselves at Tahoe's expense. The trial court found that the original contracts were valid and that Tahoe and P & G terminated their contract in 1981. The court also found that the parties entered an oral agreement from which Tahoe had the option of receding at will. Under this new agreement, P & G offered to continue receiving Tahoe's gas in 1981, but only at the same price as they were then paying. Since Tahoe chose to continue dealing with defendants and they paid pursuant to the oral offer, the court dismissed the suit. Tahoe now appeals, assigning as error:
(1) the finding that Tahoe had other options for marketing its gas;
(2) the finding that the parties entered a new agreement in 1981; and
(3) the failure to award Tahoe a fair and equitable price based on quantum meruit.
Unable to see manifest error in any of these findings, we affirm the trial court's judgment.

FACTS
The facts begin in the mid-1970s, a period of rapid mineral exploration both in *1339 general and in Ouachita Parish. George Sanders came to Louisiana and negotiated with the Grant family, which owned a large tract of land off Sterlington Rd. in Monroe. As a result of these negotiations, the Grants executed a lease in June 1976, naming as lessee Sanders's corporation, Diablo Oil. Shortly after this, Sanders organized another corporation, defendant P & G Gathering Systems Inc. P & G set up the pipelines that would carry off the gas from the lands in the Grant lease. Monroe businessmen William D. Brown and William H. Krutzer, interested in buying P & G's gas, guaranteed Sanders's loan to erect the pipeline system.
Meanwhile the plaintiff, Tahoe Corp., came on the scene. It acquired a number of subleases from Diablo whereby Tahoe would drill and complete wells on the leased property. Tahoe drilled and completed 25 wells under these subleases.
Tahoe then entered a contract to sell the gas it extracted under the subleases. By contract dated September 28, 1976, Tahoe agreed to sell its gas to P & G for a price of $1.00 per m.c.f. Tahoe would also receive one-half of anything over $1.25 that P & G received from re-sale of the gas. The contract specified a term equal to that of the duration of Tahoe's subleases. We note that at this opening stage of Tahoe's involvement, Tahoe was surrounded by Sanders: acquiring its mineral rights by a sublease from Diablo, carrying its gas through pipes owned by P & G, and selling its gas to P & G, but Tahoe was not fenced in to the extent it later was.
P & G simultaneously entered a contract to resell the Tahoe gas. The purchaser was Gas Transportation Corp. ("GTC"), owned by Brown and Krutzer, who had backed P & G's construction finances. Under this contract, GTC was to pay P & G $1.25 per m.c.f. P & G was also to receive a 5¢ per m.c.f. escalation on the first anniversary date in 1977, and on every successive anniversary date. The term was set at five years; thus the contract would expire on October 1, 1981. Tahoe has not claimed, and the evidence does not show, that these contracts were anything but arms-length transactions.
It is obvious from the interplay of the two contracts that whatever price P & G could fetch for Tahoe's gas would enure to Tahoe's benefit if it exceeded $1.25. Following the terms of the P & G/GTC contract, P & G would receive in the final year $1.45 per m.c.f. and Tahoe would receive $1.10. There is no provision regulating a bargain between P & G and GTC after the five years expired, although Tahoe would surely benefit from any higher price obtained thereafter.
Less than a year after these contracts went into effect, Sanders decided to move to Texas and to sell his interests in Ouachita Parish. He sold all his P & G stock to GTC, thus making P & G a wholly-owned subsidiary of GTC. He also assigned all of Diablo's rights in the Grant lease to GTC. Thus at this point GTC owned all the entities that surrounded Tahoe, although the initial sale and re-sale of Tahoe gas were governed by contracts entered into in September 1976. There is no evidence of plan or design on the part of GTC to acquire P & G or any of Sanders's holdings for the purpose of suppressing Tahoe's price.
On the first anniversary, GTC escalated its price by 5¢ according to contract; P & G in turn paid an extra 2½¢ to Tahoe. The subsequent escalations were also honored so that in the final year Tahoe was indeed receiving $1.10 per m.c.f., as originally intended by P & G and GTC.
Meanwhile, the price of natural gas rose beyond all expectation. Price increases were so dramatic that Congress intervened, passing the Natural Gas Policy Act of 1978 ("NGPA"), authorizing maximum prices for natural gas. Pub.L. 95-621, 92 Stat. 3366; see esp. 15 U.S.C. § 3318. Tahoe was placed in the hands of a Trustee, Mr. William Deal, by action of the Securities and Exchange Commission. Mr. Deal was obviously not content to see Tahoe getting barely over a dollar for gas when the NGPA and market prices were over twice that.
In an effort to get a better price for Tahoe's gas, Deal came to Monroe in 1979 *1340 or 1980 to call and meet with Krutzer. Deal came back about a year later, demanding renegotiation. He had received from GTC's general counsel a letter of July 2, 1981, asserting that P & G would not renegotiate its contract with Tahoe. Tahoe Ex. 10. Deal met with Krutzer and insisted that because Krutzer and Brown now owned both companies, P & G was no longer an independent entity and, especially after October 1981, any contract with GTC could be disregarded, with the result that the prices GTC got from its purchasers could be passed directly along to Tahoe. Krutzer maintained that P & G was indeed a distinct legal entity and that he would keep the contract in force. Deal next insisted that Tahoe's wells qualified for maximum prices under NGPA. Subsequent to the July 1981 letter, however, Krutzer and Brown had discussed the subject at length and decided that they could not offer a price increase to Tahoe. They had bought P & G in large measure because of its ability to get cheap gas; a decision to pay more would upset the profitability of the scheme. Deal later met with Brown, who said that although he would have liked to be able to offer more for the gas, he could not justify it. Krutzer testified that in his last meeting with Deal, he told him conclusively that there would be no price increase for Tahoe gas. He advised Deal that Tahoe was free to take its gas elsewhere and discontinue selling to P & G at any time. He advised, however, that if Tahoe elected to continue selling to the P & G system, it would receive no more than the price then in force. Krutzer testified to a certainty that when Deal went away from the last meeting, he understood all this and agreed to it. Brown's testimony corroborated Krutzer's understanding of the agreement reached with Deal. Neither Krutzer nor Brown ever heard from Deal again until the suit was filed.
Brown and Krutzer both testified about the price GTC paid for gas. They admitted that it paid some of its suppliers considerably more for gas, almost the NGPA maximum, but insisted that these prices were based on other factors, such as the quality of the gas, the demand, the quantity purchased and the age and length of the contract. They also admitted paying the original lessors, the Grants, an override in excess of that provided in the lease, but said this was done to settle disputes with Arthur Grant over the number of wells to be drilled and a right-of-way agreement. The trial court noted that their testimony was believable and he accepted it.
For Tahoe's part, Deal did not testify; therefore Tahoe did not advance its own version of the 1981 negotiations. Tahoe argued that the alleged options under the 1981 contract were not viable options at all. The option of selling its gas elsewhere was not viable because P & G owned the only pipeline that serviced the wells, so there was no other immediate vendee; the option of shutting in its wells was unrealistic, given the contractual shut-in penalties; and the option of continuing to sell at $1.10 was unrealistic in light of the NGPA price of nearly $4.00 then in effect. Thus Tahoe claimed that after Deal's meetings with Krutzer and Brown, it had no alternative but to continue selling as before, but that this was not consent to a new agreement. Tahoe next argued that it never receded from its 1976 contract in the first place and was entitled to receive payments based on the contractual formula and GTC's price. Tahoe finally argued that its contract with P & G was invalid for lack of a determinate price or breach of good faith, thus entitling it to a quantum meruit award of the full NGPA price.
The trial court turned away each of these arguments, relying heavily on the credibility of Brown and Krutzer. It held that the pricing provisions under Tahoe's 1976 contract were indeed determinate and that P & G performed its obligations, both with Tahoe and with GTC, in good faith. It also held that Tahoe and P & G terminated their 1976 contract by mutual consent in a meeting in 1981. It finally held that as a result of that meeting, a new agreement was confected whereby P & G would buy any gas that Tahoe chose to sell it for a flat rate of $1.10, Tahoe reserving the right to withdraw and sell elsewhere at any time. The trial court observed in closing that *1341 Tahoe could not now call on the court to relieve it of a bad bargain.

DISCUSSION
We note at the outset that amid these various and sometimes conflicting arguments, the bulk of Tahoe's evidence sought to show the price that GTC was getting for gas in transactions with third parties. This evidence would have tended to show a "fair price" if Tahoe had proven an entitlement to quantum meruit. This evidence was also intended to show bad faith on the part of P & G and GTC; however, Tahoe has disclaimed any allegations of error, fraud or duress which would result in unfair price differentials. For these reasons, the mountain of evidence of what GTC paid third parties for gas is largely irrelevant and we have confined ourselves to the true issues of law and manifest error.

ASSIGNMENTS 1 & 2
By these two assignments Tahoe claims the trial court committed manifest error in its analysis of the 1981 meetings between Deal, Brown and Krutzer. It claims that it had no options after October 1981 and therefore there was no new agreement; it also claims it never consented to terminate the original 1976 contract.
We have closely examined the options conferred by the 1981 agreement. Tahoe's sublease from Diablo imposed a penalty of $100 per well per month for shutting in the wells "to avoid a captive market." We agree that the shut-in provision would have been burdensome but it is more of an incentive to maintain production than an absolute prohibition against shutting in. The same applies to the avoidance of a captive market. GTC relied on Tahoe's gas to fulfill its obligation to ultimate users, including LP & L. Tahoe's production averaged 10,000 to 15,000 m.c.f. per month, thus representing about 10% of GTC's delivery to LP & L. R.p.p. 318, 373, 415. If Tahoe had elected to shut in, then GTC might have missed its quota to its largest customer, or perhaps have been forced to make up the deficit by buying from other producers at considerably higher prices. This might have induced Brown and Krutzer to renegotiate more favorably with Tahoe. Under the facts, this option was viable.
The option of finding other vendees for Tahoe's gas also seems far from impossible. Admittedly, the laying of multiple pipelines can create problems, as in Harris v. Arkansas La. Gas Co., 357 So.2d 1249 (La.App. 2d Cir.1978), and can be costly; Sanders's system cost approximately $125,000 in 1976. R.p. 349. However, Krutzer testified that Deal could have sold Tahoe's gas to Ashland Oil, Mid-La. Gas, or to IMC, and he did not mention any particular problem with it. R.p. 336. This is significant because Krutzer, now in control of the Grant lease, presumably would have known whether alternate lines at its well sites were available or would have been prohibited. The map, Tahoe Ex. 12, does not mention any restriction. Significantly, Deal himself approached T.A. Grant with an offer to sell gas. This indicates that Deal believed he had the right to sell elsewhere. Under the circumstances, we cannot say this option is untenable.
The third option was the one ultimately exercised, the continuation of sales to P & G at a fixed price of $1.10 per m.c.f. According to Tahoe this was not viable because it not only continued the price then in effect but eliminated the prospect of increases under the 1976 formula. Thus Tahoe's position under the new agreement is worse than under the old and Tahoe never would have accepted it. However, these terms must be viewed in the context of the whole agreement. Tahoe had the continuing option of cutting off its sales to P & G and selling its gas elsewhere for a better price. This option to recede, or "economic out," is consideration sufficient to justify accepting a low, locked-in price. With this proviso, the third option was completely viable. Thus we cannot accept Tahoe's argument that the options were unrealistic or impossible.
The evidence supports the finding that Deal accepted Brown and Krutzer's new offer in 1981. As we noted earlier, Krutzer clearly advised Deal that he could make other arrangements to sell Tahoe's *1342 gas but that any further sales to P & G would be at a flat rate of $1.10 per m.c.f. He testified that Deal understood and agreed. R.p. 408. Brown corroborated this. R.p. 417.
Tahoe's conduct after October 1981 provides even more evidence that Brown and Krutzer's offer was accepted. Tahoe continuously sold its gas to P & G and accepted the payments based on $1.10 per m.c.f. each month. An offeree may accept by performance, LSA-C.C. 1939; St. Romain v. Midas Exploration Inc., 430 So.2d 1354 (La.App. 3d Cir.1983). This is so even when the new agreement is a variation or modification of a previous agreement. Bank of La. in New Orleans v. Campbell, 329 So.2d 235 (La.App. 4th Cir.1976), writ denied 332 So.2d 866 (La.1976). The trial court appropriately observed that Tahoe received the benefits of the new agreement for three years; the finding that this amounted to acceptance is not manifestly erroneous and we affirm it.
Tahoe next claims that it did not terminate the 1976 contract in the course of the 1981 discussions. The 1976 contract was to remain in effect for the duration of the Grant lease. Tahoe also cites the letter of July 2, 1981 as evidence that GTC had no intention of terminating, renegotiating or amending P & G's contract with Tahoe.[1] Tahoe finally contends that Brown and Krutzer's testimony concerning the 1981 meetings was self-serving, distant from the events, and contradictory to the clear impact of the letter.
While this argument has a certain appeal, it overlooks the sequence of events that the trial court accepted and the evidence supports. The most serious negotiations took place after the July 2, 1981 letter, which in effect "set the stage" for the talks. R.p. 341. Brown and Krutzer were the true parties in interest and obviously had the authority to restate P & G's position and bind the company by their negotiations. The trial court concluded that the final resolution was embodied in the discussions between Deal, Krutzer and Brown, and not in the preliminary letter. The evidence clearly shows that Deal was at loggerheads with Brown and Krutzer after their unsuccessful and unamicable meetings. Brown and Krutzer testified that by the summer of 1981, they were quite willing to let Tahoe out of its obligation. R.p. 417. This is more than sufficient to show P & G's consent to the termination as required by LSA-C.C. art. 1983.
As for Deal's consent to terminate, Deal's silence of almost two years and his inaction after the meeting, together with the special circumstances of the case corroborate that he understood and agreed to terminate. LSA-C.C. art. 1942; RTL Corp. v. Mfrs.' Enterprises Inc., 429 So.2d 855 (La.1983), and citations therein; Allan v. Arnold, 673 F.2d 767 (5th Cir.1982). Here the special circumstances included the impasse the parties had reached in attempting to renegotiate the 1976 contract, and the subsequent adoption of a new agreement. Deal himself was dissatisfied with the contract because he felt it was paying Tahoe inadequately for gas. R.p. 333. Given the stalemate and the determination of both sides, Deal's prolonged silence after his meeting with Krutzer corroborates his consent both to terminate and enter into a new arrangement.
Looming over both these assignments is the conspicuous absence of any testimony from Mr. Deal, who negotiated for Tahoe. His version of events, if they corroborated the content of the letter and differed with Krutzer and Brown, would have weighed in Tahoe's favor and perhaps *1343 would have affected the outcome of the case. Even though Mr. Deal was reported to be unable to testify because of illness, Tahoe had ample time to depose him between April 1983, when the suit was filed, and April 1986, when the trial took place. LSA-C.C.P. art. 1437. There was also the possibility of interrogatories addressed to him, LSA-C.C.P. 1421, and of a motion for continuance before trial, LSA-C.C.P. art. 1601. A request could even have been made at the end of the trial to leave the record open for his testimony. However, without any more satisfactory explanation for Mr. Deal's absence, we may presume that his testimony would have been adverse to Tahoe, i.e., it would have corroborated Krutzer and Brown. See RTL Corp. v. Mfrs.' Enterprises Inc., 444 So.2d 144 (La.App. 1st Cir.1983); Tillman v. Canal Ins. Co., 305 So.2d 602 (La.App. 1st Cir. 1974), writ denied 307 So.2d 630 (La.1975). On the record as it stands, there is not enough evidence to sustain an argument of manifest error. These assignments are without merit.

ASSIGNMENT 3
By this assignment Tahoe argues the trial court should have awarded a fair and equitable price for the gas sold under the 1976 contract, both before and after the expiration of the P & G/GTC contract. This is based on the contention that the contracts failed for lack of a determinate price or for breach of the duty of goodfaith performance.
If a contract fails for lack of a determinate price, and the seller nevertheless performs, then he is entitled to receive a fair and equitable price under the theory of quantum meruit. Benglis Sash & Door v. Leonards, 387 So.2d 1171 (La.1980); B & B Cut Stone v. Resneck, 465 So.2d 851 (La.App. 2d Cir.1985); cf. U.C.C. § 2-305. The issue of determinate price breaks down into two time frames and is easily resolved in both. As for the time after October 1981, the trial court found that there was a new contract under which P & G offered to buy Tahoe's gas for a flat rate of $1.10 per m.c.f., and that Tahoe accepted this by its acquiescence and performance. LSA-C.C. art. 1939; Stupp Corp. v. Con-Plex, Div. of U.S. Indus., 344 So.2d 394 (La.App. 1st Cir.1977). This portion of the judgment has withstood the attack of manifest error and the agreement clearly provides for a determinate price. LSA-C.C. arts. 2439, 2464.
Tahoe next contends that under the 1976 contract, the price after 1977 is not determinate. Tahoe claims that the formula of $1.00 plus one-half of any price that P & G receives on re-sale is not concrete enough to satisfy the need for a determinate price. This is not correct. The jurisprudence clearly establishes that a price, though not determined at the moment of sale, is valid if it is objectively determinable. See, e.g., Louis Werner Sawmill Co. v. O'Shee, 111 La. 817, 35 So. 919 (1904), 2 Planiol, Traite' Elementaire de droit civil no. 1378 (11th ed. 1937). Courts have held that a price may be determinable by reference to external factors such as the market price. Landeche Bros. Co. v. N.O. Coffee Co., 173 La. 701, 138 So. 513 (1931); Baucum & Kimball v. Garrett Mercantile Co., 188 La. 728, 178 So. 256 (1937). We think the price here is determinate until October 1981 by reference to P & G's contract with GTC. This contract provided for a price of $1.25 with annual increases of 5¢, thus translating into a price for Tahoe of $1.00 with annual increases of 2½¢. Furthermore, Tahoe had the right to "examine the books, records, and charts of the other party * * * to verify the accuracy of any statement, payment calculation or determination[.]" Tahoe Ex. 3 B, p. 11-A. This gave Tahoe the right to determine P & G's resale price and to apply the formula. These arguments lack merit.
Tahoe next argues its contracts with P & G should fail because Brown and Krutzer did not perform in good faith. The first act of alleged bad faith came when GTC acquired P & G. Tahoe contends that Brown and Krutzer should have let Tahoe deal directly with GTC and calculate its price based on what GTC got on resale. Tahoe does not support this argument with any legal theory except an appeal to equity; *1344 it specifically denies fraud, error, misrepresentation or lack of arms-length dealing. When Tahoe entered the agreement in 1976, it surely understood that it was not selling to an ultimate user but to a middleman who gathered gas to sell to users at a profit; it obviously was satisfied with the price. When GTC acquired P & G, they did not merge but each retained its distinct corporate status. GTC could not be compelled to deal directly with P & G's seller. The suggestion of bad faith loses more force when we remember that P & G's sales to GTC were regulated by a contract that was entered before the latter acquired the former; this contract was never broken.
Tahoe's argument is somewhat stronger as it approaches the October 1981 time frame. By that time, P & G's contract with GTC was about to end and, with it, the low price of $1.45 per m.c.f. If P & G had been pursuing only its own interests, then it would have eagerly sought the highest possible price for its gas, even if it meant sharing part of its profit with Tahoe. This is surely what Tahoe expected from the price escalation clause: the active pursuit of a higher price, to benefit both P & G and Tahoe. However, once GTC acquired P & G, P & G's owners could be content to make their money from GTC's sales. P & G had no incentive to seek a better price from GTC, and the owners could easily decide to keep the price low between P & G and GTC. This would benefit Brown and Krutzer while completely leaving Tahoe out of the picture. We repeat that Tahoe's petition does not allege fraud, error or misrepresentation.
At oral argument, Tahoe's counsel characterized the 1976 contract as a "gas brokerage agreement." While this characterization is not correct, we mention it because it describes a contractual relationship in which the parties are held to a higher standard than a mere good faith duty of performance. In a brokerage contract, the broker or mandatary owes his principal or mandator a fiduciary duty not to profit at his expense. LSA-C.C. arts. 3004, 3005, 3011. In the typical brokerage situation, the broker is responsible for finding a purchaser for the principal's goods. If the broker enters into a secret deal with a third party to sell at a low price, and then splits the profit the third party receives on re-sale, then the broker is liable to his principal for the hidden profit. See Uhlich v. Medallion Realty, 334 So.2d 788 (La. App. 4th Cir.1976), writ denied 338 So.2d 701 (La.1976).[2]
We have questioned whether the instant contract was an agency or a genuine sale. The contract itself is styled a "Gas Purchase Contract" and the parties are referred to constantly as "Seller" and "Buyer." Article IV, Sec. 1 provides that title will pass at the point of transition from PVC pipe to steel pipe at the upstream riser to the master measuring station. This section further provides that until delivery, the seller is deemed in possession and control of the gas, and holds it at his own risk. After title passes, the possession, control and risk are the buyer's. Possession and risk are classic indicia of ownership, and the transfer so particularly detailed is indicative of a sale. See 2 Litvinoff, Obligations § 149 (1975). Article V refers to the amount paid as a "price," not as a commission. There is no provision for returning the gas if P & G was unable to sell it. These further indicate an intent to enter a contract of sale and not of brokerage. This corresponds to the designation of the contract as a "Gas Purchase Contract." There is no grounds to support a claim that the contract was an agency.
Besides agency, there are other legal relationships that impose fiduciary duties on parties. A director or officer of a corporation owes a fiduciary duty to his corporation. LSA-R.S. 12:91. Unless special disclosure is made, a director or officer may not acquire an interest adverse to his corporation. LSA-R.S. 12:84; note, La.L. Rev. 320 (1975). Similarly, a partner owes *1345 a fiduciary duty to the partnership and his partners. LSA-C.C. art. 2809. This line of analysis shows the degree of duty necessary to hold P & G to the duty of seeking the most favorable price or of sharing its "secret" profits with Tahoe. If a corporate officer of Tahoe had acquired controlling interest in GTC and used the Tahoe to P & G to GTC sales structure to suppress Tahoe's profit, then Tahoe could claim breach of fiduciary duty. However, P & G was bought by GTC, which had no prior contractual ties with Tahoe, and certainly did not owe it any fiduciary duty.
Likewise, P & G's relationship with Tahoe was merely contractual. P & G was therefore bound to good faith performance, LSA-C.C. art. 1759, and not a fiduciary duty. P & G performed according to contract until October 1981. Around that time, Tahoe began to clamor for changes in the terms of sale. Because the parties were unable to renegotiate the old contract, they terminated it and entered into a new one. The trial court found that P & G's actions, taken through Brown and Krutzer, were arms length and reasonable within the industry. His implicit holding that there was no breach of good faith is not manifestly erroneous.
Tahoe finally contends that the principles of equity should operate to release it from a situation that has turned out to be very unfavorable. The law is quite clear, however, that equity cannot take the place of contracts legally entered; courts have no authority to relieve a litigant of a bad bargain, Hinterlang v. Usner, 215 La. 626, 41 So.2d 455 (1949); Ardoin v. Central La. Elec. Co., 318 So.2d 5 (La.1975); Chemical Cleaning Inc. v. Brindell-Bruno Inc., 214 So.2d 215 (La. App. 4th Cir.1968). In September 1976, all the corporate entities were in place and their alignment in the sequence of sales was established. Tahoe signed a contract locking it to what the parties considered a fair price; no one expected the unprecedented rise of gas prices. Tahoe cannot expect the courts to rescind its legally binding contract just because its business judgment was poor. Nor can it demand a change in performance just because its vendee underwent a change in ownership. In October 1981, Tahoe entered a new agreement at an admittedly low price, but retained a valuable concession of being able to withdraw at any time. The arguments advanced in this assignment do not warrant reversal.
Accordingly, the judgment is affirmed at appellants' costs.
AFFIRMED.
NOTES
[1] This letter provided in part:

Accordingly, it is our [GTC's] firm and final position that Tahoe Corporation is being paid exactly what it should be paid under the terms and conditions of the contract mentioned above. As you can see from the term of the gas purchase agreement between P & G and [GTC], a new contract must be negotiated prior to October 1, 1981 and at that time the price should increase to the NGPA price. We have explained our position to Mr. Davis on several occasions and that we have felt that we are under no duty to re-negotiate the contract between P & G and Tahoe and still do not feel that it is our duty to do so. You obviously feel difference [sic] and therefore it is certainly your prerogative to seek whatever course of action you desire.
[2] In Uhlich, the broker acted on behalf of a buyer instead of a seller, but the concept is the same.