NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2021 CA 0008

MICHAEL BERGERON, PAUL BERGERON,
AND LEAH BERGERON JONES

VERSUS

MARY BETH ANDERSEN, AMY BERGERON,
AND GREGORY BERGERON

*Judgment Rendered:*   DEC 2 2 2021

* * * * * * *

Appealed from the
18th Judicial District Court
In and for the Parish of Point Coupee
State of Louisiana
Case No. 48451

The Honorable J. Kevin Kimball, Judge Presiding

* * * * * * * *

| | |
|---|---|
| Scott L. Smith, Jr.<br>New Roads, Louisiana | Counsel for Defendant/Appellant<br>Gregory Bergeron |
| Sharon Starkey Whitlow<br>Baton Rouge, Louisiana<br>and<br>Lonny E. Guidroz<br>New Roads, Louisiana | Counsel for Plaintiff/Appellee<br>Michael K. Bergeron |

* * * * * * * *

BEFORE: WHIPPLE, C.J., McCLENDON, WELCH, THERIOT, AND
LANIER, JJ.

McClendon, J. dissents and assigns reasons

Welch, J. dissents for reasons assigned by Judge McClendon

**THERIOT, J.**

In this partition suit involving property owned in indivision, a dispute arose between the co-owners concerning the outcome of the agreed-upon private sale. For the reasons set forth herein, we affirm.

## FACTS AND PROCEDURAL HISTORY

The parties to this suit are the six children of the late Ruffin Leon Bergeron, Jr., who died testate on July 4, 2012. After his succession was opened and his testament probated, a September 28, 2017 judgment of possession recognized Ruffin's six children as universal legatees and owners in indivision of certain immovable and movable property in Pointe Coupee Parish.

On April 13, 2018, a Petition to Partition Property was filed by three of the co-owners: Leah Bergeron Jones, Michael ("Mike") Bergeron, and Paul Bergeron. The remaining three co-owners were named as defendants: Mary Beth Bergeron Andersen, Amy Bergeron, and Gregory ("Greg") Bergeron. In the petition, the plaintiffs alleged that the immovable property, consisting of farmland, a riverfront lot, tool sheds, and outbuildings, could not be partitioned in kind without a diminution in value. The plaintiffs further alleged that while all co-owners agreed to list the riverfront lot for sale, they were unable to agree on a nonjudicial partition or sale of the remaining immovable property. Plaintiffs sought a public *in globo* sale of all of the immovable property listed in the Judgment of Possession, with the exception of the riverfront lot, which they alleged should be sold at a separate public sale in order to produce greater net proceeds.[1]

During the pendency of these proceedings, La. C.C. art. 811, which governs partition of property owned in indivision, was amended to provide that where one or more of the co-owners have not consented to a partition by private sale, the court may set the terms of the sale and order a partition by private sale. See Acts

---

[1] The petition also sought a judicial partition of certain movable property of the Estate; however, the movable property is not at issue in this appeal.

2020, No. 281, § 1, eff. June 11, 2020. Prior to this amendment, the trial court lacked discretion to order a private sale in the absence of agreement between the co-owners, and a judicial partition was the only available method. *Treas v. Koerner*, 2019-0390, pp. 16-17 (La.App. 4 Cir. 11/13/19), ___ So.3d ___, ___, *writ denied*, 2020-00044 (La. 2/26/20), ___ So.3d ___.

Following the amendment of Article 811, the parties entered into a July 2, 2020 stipulated judgment, which contained the following provisions for the sale of the property: The property will be sold by private sale. The property will be listed for a period of six months, and if not sold by the expiration of the listing period, the property will be sold by sheriff's sale. Each tract of immovable property will be listed separately, with the listing price of each set by a third party based on market analysis. During the first ninety days of the listing period, any offers above eighty percent of the listing price will be accepted; during the second ninety days of the listing period, any offers that are above two-thirds of the listing price will be accepted. After any such acceptable offer, the realtor shall have the right to solicit higher offers for a period of thirty days; thereafter, he shall present the highest offer to the co-owners. Any co-owner shall have a right of first refusal to counteroffer above the offered price within seven days of receipt of any such offer.

In accordance with the stipulated judgment, the individual tracts of immovable property were listed for sale, and offers were received on Lots 2 and 4 and the farmland, all of which were over the eighty-percent threshold. Following the thirty-day period for soliciting higher offers, the highest offers were presented to the co-owners, and the seven-day period began for the co-owners to exercise their right of first refusal by submitting counteroffers above the highest offered price.

Neither the stipulated judgment nor the listing agreement contained any detail about the seven-day right-of-first-refusal period beyond the statement in the

3

stipulated judgment that "[a]ny owner shall have a right of first refusal during the listing period to counteroffer above the offered price within 7 days of receipt of any such offer." Mike and Greg, either individually or through their attorneys, contacted the listing agent, Philip Cazayoux, to attempt to clarify how the process for making counteroffers would work. Cazayoux responded by email that his "interpretation" of the stipulated judgment was that the co-owners would have seven 24-hour periods, without regard to business hours, weekends, or holidays, in which to make counteroffers, and the seven-day period would end at "12 midnight." At the expiration of the seven-day period, the highest offers would be accepted. Cazayoux was also asked about acceptable transmission methods for offers, since the expiration of the seven-day period would be outside of normal business hours, and about whether he would accept sealed offers. He responded:

> I am accepting offers in the form of a Louisiana land purchase agreement. Email is the preferred method of delivery. . . . I am not [accepting sealed offers with "do not open until [date]" instructions]. I am submitting all bids as I receive them to the attorneys[,] which are then shared with the heirs.

On August 26, 2020, the final day of the seven-day period, both Mike and Greg submitted offers on the Louisiana land purchase agreement form provided by Cazayoux for Lots 2 and 4 and the farmland. On each of Mike's offers, which were sent via email at 11:55:03 p.m., in the space provided for the purchase price, he wrote "See Bid Addendum." The addenda for the offers on Lots 2 and 4 and the farmland, respectively, stated:

8/26/20

Addendum for Bid price - Lot 2

I will pay $31,169.69 for Lot 2, but if there is another bona fide offer that's higher than mine at any time up to the deadline of 11:59 tonight, I'm willing to increase my offer by increments of $69.69 to beat any offer up to a maximum of $51,000.69.

4

8/26/20

Addendum for Bid price - Lot 4

I will pay $55,069.69 for Lot 4, but if there is another bona fide offer that's higher than mine at any time up to the deadline of 11:59 tonight, I'm willing to increase my offer by increments of $69.69 to beat any offer up to a maximum of $115,000.69.

8/26/20

Addendum for Bid price- FARM ACREAGE

I will pay $6,120.69 per acre for the estate farm property acreage, but if there is another bona fide offer that's higher than mine up to the deadline of 11:59 tonight, I'm willing to increase my offer by increments of $69.69 per acre to beat any offer up to a maximum of $8,001.69 per acre.

Greg submitted his offers via email at 11:59:57 p.m., in the following amounts: Lot 2, $35,006.00; Lot 4, $70,077.00; and the farmland, $6,124.30 per acre.

Although Cazayoux had advised counsel for Mike and Greg that he would forward offers to counsel as they were received during the seven-day period, it is undisputed that these offers, which were received immediately before the deadline, were not forwarded to counsel prior to the expiration of the bidding period.

Following the close of the seven-day period, a dispute arose concerning which party had submitted the highest offer to purchase the property, since Greg's bids were higher than Mike's starting bids, but lower than the maximum prices given in the "escalation clauses." On September 3, 2020, Mike filed a motion seeking to have the court order Greg and Mary Beth[2] to execute a cash sale conveying their respective interests in Lots 2 and 4 and the farmland to Mike.[3] Mike alleged that, through the operation of the escalation clauses contained in the addenda to his offers, he submitted the highest offers to purchase the property. Greg filed his own motion, alleging that Mike's offers were invalid and seeking to

[2] The remaining siblings had previously sold their interest in Lots 2 and 4 and the farmland to Mike.

[3] Mike's motion also included a rule for contempt, but that rule was waived at the hearing and is not at issue on appeal.

have the court designate him as the highest bidder and grant him the right to purchase the property at his offered prices.

A hearing was held on the motions on September 9, 2020. At the hearing, Greg argued that Mike's offers were invalid due to the use of the escalation clauses. He also argued that even if the escalation clauses were valid, they had expired by the time Greg's offers were received. Greg's position was that since Mike's escalation clauses stated that he would outbid offers received up to the deadline of 11:59, and Greg's offers were received at 11:59:57, the escalation clauses had expired by the time Greg's offers were received and could not operate to increase Mike's offers. In ruling, the trial court explained that the process for this sale, which was created by stipulated judgment in response to the recent change in the law, was created with the goal of ensuring that the co-owners received the highest price for the land and included what was "more or less an auction [for the] seven day period at the end of the public bids." The trial court rejected Greg's argument that Mike's reference to 11:59 meant 11:59:00 rather than 11:59:59, and did not find Mike's use of escalation clauses to be improper under the circumstances. However, considering the goal of getting the highest price possible for the co-owners, as well as the lack of detail in the stipulated judgment about the procedures for the private sale, the trial court ordered that, in the interest of equity, bidding would be reopened on the next court date of September 24, 2020, at which time any of the co-owners who wanted to bid on the property could do so.

At the hearing on September 24, Greg's attorney informed the trial court that Greg elected not to submit new bids on any of the properties. Thereafter, the trial court concluded that the highest offers were Mike's offers of $35,075.69 for Lot 2, $70,146.69 for Lot 4, and $6,193.99 per acre for the "Farm Land." The trial court issued a judgment on September 28, 2020, ordering Greg and Mary Beth to

6

execute cash sales in favor of Mike; ordering Mike to pay the proceeds due to Greg and Mary Beth immediately upon execution of the cash sales; and declaring Mike to be the owner of Lots 2 and 4 and the farmland. Greg filed a suspensive appeal.

**DISCUSSION**

Greg's sole assignment of error on appeal asserts that the trial court erred in granting Mike's motion because Greg's were the last valid and highest offers made before bidding closed. Greg argues that Mike's offers used non-legal means, i.e., invalid and expired escalation clauses, to outbid Greg's offers, and therefore were not valid.

Greg argues that Mike's offer was invalid because it did not contain a price in money, in a sum either certain or determinable by a method agreed by the parties. The requirements for the perfection of a sale are the thing, the price in money, and the consent of the parties. La. C.C. art. 2439. The price element of a contract of sale requires a price in a sum either certain or determinable through a method agreed by the parties. La. C.C. art. 2464. Greg argues that the entry "See Bid Addendum" in the space provided for the purchase price on the purchase agreement form was not a "price in money." Further, he argues that because the parties did not agree to the method used by Mike to determine the price, i.e., the escalation clause, the price is not determinable.

In order to perfect a contract of sale, there must be an agreement as to the price and the thing. La. C.C. Arts. 2439, 2456, and 2464.[4] However, it is not essential that the specific sum of the sales price be stated at the time of contracting, as long as the price may be ascertained by computation. *Benglis Sash & Door Co. v. Leonards*, 387 So.2d 1171, 1172 (La. 1980). A price shall be deemed as "certain" where it may be ascertained by computation of definite facts, including

---

[4] Although this case concerns a contract to sell, as opposed to a contract of sale, La. C.C. art. 2623 provides that "[a] contract to sell must set forth the thing and the price, and meet the formal requirements of the sale it contemplates."

7

reference to external factors such as the market price. <u>See</u> *Tahoe Corp. v. P & G Gathering Systems, Inc.*, 506 So.2d 1336, 1343 (La.App. 2 Cir. 1987); *Hearty Burger of Harvey, Inc. v. Brown*, 407 So.2d 806, 808 (La.App. 4 Cir. 1981).

In this case, the price offered by Mike for each piece of property was ascertainable by computation of definite facts. That is, Mike offered a specific sum, which would increase in specified increments in the event higher offers were received, until it exceeded all other offers, up to a maximum price. As such, the price offered by Mike in each of his offers is deemed certain, and the offers are not invalidated for lack of a price.

Greg's argument that the method for determining the price had not been agreed to by the parties is likewise without merit. Neither the stipulated judgment nor the listing agreement contained any detail regarding the process for the co-owners to exercise their right of first refusal, aside from the time period within which to do so. The details for the process provided by Cazayoux were noted by the court to be extrajudicial. Louisiana Civil Code article 2054, regarding interpretation of contracts, provides that where the parties made no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose. As stated by the trial court, the goal of this private sale was to get the highest possible purchase price for the co-owners. Additionally, Louisiana Real Estate License Law specifically authorizes the use of addenda to the purchase agreement form,[5] and Cazayoux's affidavit, which was filed in evidence at the hearing, stated that the use of escalation clauses in real estate transactions is "a normal ethical business practice," which has been used by and against him and his broker on several occasions. We find no manifest error in the

---

[5] La. R.S. 37:1449.1(A).

8

trial court's conclusion that Mike's offers, including the addenda and escalation clauses, are valid.

Greg next argues, as he did at the hearing on the motions, that the escalation clauses used by Mike do not contain actual offers, since Mike's use of the phrase, "I'm willing to increase my offer," does not constitute an unconditional, unqualified, unequivocal intent to be bound. The Louisiana Supreme Court has held that one who proposes the contract is bound if the offer is made in terms, whether by words, actions, silence or inaction, which evince a design to give the other party the right of concluding by assent, and the other party timely assents. When consent is not express, or when the law creates no presumption of consent, the trial judge is to ascertain, from the facts and circumstances of the case, whether the parties' consent is to be implied from them. *Knecht v. Board of Trustees for State Colleges & Universities & Northwestern State University*, 591 So. 2d 690, 694 (La. 1991); see also *Blair Rubber Co., Inc. v. Altra Coatings Technology, Inc.*, (La.App. 5 Cir. 1991), 575 So.2d 504, 505, *writ denied*, 577 So.2d 37 (La. 1991) (the words "I am willing to" were found to be clear and unequivocal and express an intent to be bound, rather than an invitation to negotiate). The trial court herein obviously concluded, despite Greg's argument to the contrary at the hearing, that the language used by Mike expressed an intent to be bound by the escalation clause. Considering the language used in light of the facts and circumstances of this case, we find no manifest error in this finding.

Greg's next argument is that Mike's escalation clauses had expired by their own terms at 11:59:00 p.m., prior to the receipt of Greg's offers at 11:59:57 p.m., and therefore could not operate to outbid his offers. Although the escalation clauses state that Mike will increase his offer prices to outbid higher bidders "up to the deadline of 11:59," Greg insists that the court should interpret this to mean 11:59:00 p.m. rather than 11:59:59 p.m., even though such an interpretation would

9

leave almost a minute on the clock. In rejecting this argument, the trial court noted that a lot of the terms concerning the process for the seven-day bidding period were "extrajudicial" and not something that had been brought before the court. For instance, the stipulated judgment does not mention a midnight deadline, but rather simply states that the co-owners may exercise their right of first refusal by making a counteroffer "within 7 days of receipt of [the highest offer received in the thirty-day period]." Although the trial court did not believe there was any legitimate confusion about the language used in Mike's escalation clauses, the trial court nevertheless pointed to the rules of contractual interpretation, which provide that words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract, and a provision susceptible of different meanings must be interpreted with a meaning that renders it effective rather than one that renders it ineffective. La. C.C. arts. 2048 & 2049. Considering the language used in the escalation clauses in light of these rules of contractual interpretation, the court stated, "the only way I can read it is that they meant to the end of the bid period." We find no error in this finding by the court. The use of the phrase "up to the deadline of" before the time makes it clear that Mike did not intend to have the escalation clause expire one minute before the deadline. Interpreting the provision with the meaning that will render it effective rather than ineffective leads to the logical conclusion that the escalation clause did not expire at 11:59:00.

Greg's next argument against the use of escalation clauses is that this court held in *Stupp Corp. v. Con-Plex, Division of U.S. Industries*, 344 So.2d 394 (La.App. 1 Cir. 1977), that the use of escalation clauses requires the consent of the parties, which he alleges did not occur. In *Stupp*, the buyer inquired as to the seller's current price for its products and then sent a purchase order form for a certain amount of products at the current prices provided by the seller. The seller

10

sent the buyer an order acknowledgment, which contained the substance of the original purchase order (as amended by verbal agreement of the parties), as well as a number of conditions of sale on the reverse side. One condition stated that the products would be billed in accordance with seller's posted prices in effect at date of shipment (the "escalation clause"). The buyer then issued an amended purchase order, incorporating the modifications the parties had agreed upon, but not mentioning or incorporating the seller's conditions. *Stupp*, 344 So.2d at 394-95. A dispute later arose about whether the price was fixed or subject to increases pursuant to the escalation clause, and the court held that "the misunderstanding regarding the inclusion of [the seller's] escalation clause in the contract demonstrates that there was no meeting of the minds on the price issue." Absent agreement on the price, the court held that the contract was invalid for lack of consent. *Stupp*, 344 So.2d at 395-96. The situation in *Stupp* is entirely different from the situation in this case and inapplicable here, where there was no misunderstanding as to the price offered.

Greg's final argument is that Mike's use of the escalation clauses in his offers was unfair and violated principles of equity. "Equity," for purposes of contractual interpretation where the parties have made no provision for a particular situation, is based on the principles that no one is allowed to take unfair advantage of another or to enrich himself unjustly at the expense of another. La. C.C. art. 2055. Greg argues that for the sake of fairness, Mike should have obtained permission to use the escalation clauses and "should have submitted such at the onset . . . and not, literally, at the eleventh hour." This argument appears disingenuous, given that Greg submitted his offer at 11:59:57, presumably in an attempt to prevent other bidders from outbidding him. Nevertheless, the trial court, in the interest of equity, reopened bidding in order to allow Greg an opportunity to place higher bids for the property. This put Greg in the same position he would

have been in if Mike had, as Greg suggested, submitted his offers earlier in the bidding period. Despite the opportunity, Greg declined to make additional offers on the property. Given this, we find no error in the trial court's finding that Mike's offers were valid and were the highest offers received. Greg's equity argument is without merit.

## CONCLUSION

For the reasons set forth herein, the trial court's September 28, 2020 judgment is affirmed. Costs of this appeal are assessed to appellant, Gregory Belanger.

**AFFIRMED.**

# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

# 2021 CA 0008

## MICHAEL BERGERON, PAUL BERGERON, AND LEAH BERGERON JONES

## VERSUS

## MARY BETH ANDERSEN, AMY BERGERON, AND GREGORY BERGERON

*************************************************

*PMc by JEW*

**McClendon, J., dissenting.**

I disagree with the majority's decision to affirm the judgment of the trial court.

The July 2, 2020 stipulated judgment contained the following language: "Any owner shall have a right of first refusal during the listing period to counteroffer above the offered price within 7 days of receipt of any such offer." Philip Cazayoux, the listing agent for the subject properties, was asked to clarify how the process for making the counteroffers would work, as no specific details were contained in the stipulated judgment. Mr. Cazayoux advised Mike and Greg, the only family members to submit offers on the properties, that according to his interpretation of the stipulated judgment, the co-owners would have seven 24-hour periods, without regard to business hours, weekends, or holidays, in which to make counteroffers and that the seven-day period would end at "12 midnight" on the seventh day. The record does not contain any objection by either Mike or Greg to this interpretation.

On August 26, 2020, the last day of the seven-day period, Mike and Greg submitted offers on the form provided by Mr. Cazayoux for Lot 2, Lot 4, and the farmland.[1] Mike's offers on the three properties were sent by email at 11:55:03 p.m. Each of Mike's offers included escalation clauses "up to the deadline of 11:59 tonight." Greg's offers on the three properties, also via email, were sent at 11:59:57. Greg's

---

[1] The standard-form contract provided by Mr. Cazayoux was from the Greater Baton Rouge Association of Realtors.

offers were higher than Mike's starting bids, but they were lower than the maximum prices given by Mike in the escalation clauses.

Mike argues that "up to the deadline of 11:59" actually continued up to midnight. On the other hand, Greg argues that it only went up to 11:59. At the very least, the clause "up to the deadline of 11:59 tonight" is ambiguous. Further, any ambiguity as to the deadline that cannot otherwise be resolved must be interpreted against Mike, who drafted this unilateral offer made in connection with the provisions of the stipulated judgment. See LSA-C.C. art. 2056; **Melerine v. Boba**, 95-0197 (La.App. 4 Cir. 10/12/95), 664 So.2d 148, 150, writ denied, 96-0197 (La. 3/15/96), 669 So.2d 418. I do not believe, as does the majority, that we can look to the common intent of the parties regarding a document created solely by Mike.

Because the parties did not dispute the "12 midnight" deadline, and because Mike's escalation clauses stated that he would outbid offers received up to the deadline of 11:59, I must disagree with the majority's finding that Mike's offers were the last and highest offers given. The escalation clauses clearly state that they were valid "up to the deadline of 11:59." The time of 11:59 p.m. is not the same time as the deadline of "12 midnight." Accordingly, Greg's offers, which were made at 11:59:57, were clearly after the last offers made by Mike at 11:55:03 and after the expiration of the escalation clause at 11:59 p.m.

Therefore, I respectfully dissent and would reverse the judgment of the trial court.

2