United States Court of Appeals,

Fifth Circuit.

Nos. 92-3381, 92-3911.

OMNITECH INTERNATIONAL, INC., Plaintiff-Counter Defendant-Appellant,

v.

The CLOROX COMPANY, Defendant-Counter Claimant-Appellee.

Jan. 26, 1994.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before KING and JOLLY, Circuit Judges, and PARKER[*], District Judge.

KING, Circuit Judge:

Plaintiff-Appellant Omnitech International, Inc. ("Omnitech") appeals from the district court's grant of judgment as a matter of law in favor of the Defendant-Appellee The Clorox Company ("Clorox") on Omnitech's misappropriation of trade secrets, breach of contract, detrimental reliance, and breach of fiduciary duty claims. Omnitech also challenges the trial court's exclusion of expert testimony as to one of its theories of damages and seeks review of the jury's actual award of damages. Omnitech additionally requests this court to recalculate the district court's award of attorneys' fees. Clorox cross-appeals from the district court's denial of its motion for judgment as a matter of law on Omnitech's claim under the Louisiana Unfair Trade Practices Act and from the final judgment. Since we agree with Clorox that the district court improperly denied its motion for judgment as a matter of law on the unfair trade practices claim, we reverse that part of the judgment (and the associated attorneys' fees award) and render for Clorox. Finding no error with the trial court's other findings, we affirm the remainder of the judgment.

I. Background

Omnitech was in the business of manufacturing, packaging, and distributing insecticides in the southern United States during the late 1980s. Until 1988, Omnitech manufactured and packaged a roach spray which it sold through a marketing agent under the label "Bengal Roach Spray." At that

---

[*]Chief District Judge of the Eastern District of Texas, sitting by designation.

time, Omnitech and Bengal mutually agreed to terminate the distribution contract. During the course of the Bengal contract, Omnitech had developed other, related insecticidal products, including an indoor fogger. Until after the Bengal contract expired, however, Omnitech had never manufactured, distributed, or marketed its own roach spray.

Omnitech was able to duplicate successfully the Bengal formula to market as its own "Dr. X" brand after the Bengal contract was terminated.[1] Because the Dr. X product was proving to be moderately successful in the local markets, Omnitech decided to recruit an investor or marketing partner to expand the distribution of Dr. X and retained a business broker, Chaffe & Associates ("Chaffe"), to assist with this endeavor.

A. Commencement of the Relationship

Chaffe first contacted Clorox in January of 1989 about a potential venture with Omnitech. At that time, Clorox did not manufacture, sell, or distribute any insecticides, but had been researching and evaluating the insecticide industry since around 1987. According to Clorox, however, it had first become enamored with the insecticide industry in view of the enormous success of the Combat roach bait stations, first introduced by American Cyanamid in the early 1980s. Clorox' evaluation of the opportunities in this industry included investigation of, and negotiations with, Consep Membrane, Inc. ("Consep") and the Seabright Company ("Seabright"). In 1987, Clorox retained Consep to conduct technical "biorational"[2] research on cockroaches, ants, and flies for the purpose of developing a non-toxic consumer insecticide product that would be as effective as the Combat bait traps. Clorox also began evaluating a bait trap manufactured by Seabright in late 1988. In addition, Clorox investigated a bait technology developed by Dr. Phil Koehler ("Koehler") at the University of Florida. Finally, Clorox conducted its own in-house research on the insecticide category. These relationships and investigations apparently gave Clorox a variety of informational materials relating the pest-management industry or category.

---

[1]The formula was originally developed by the military, and the parties agree that the military's formula is virtually identical to both Dr. X and Bengal.

[2]"Biorational" technology is part of the emerging non-toxic pest-management business.

B. Preliminary Negotiations

In March 1989, Clorox sent several representatives to visit Omnitech's plant in Thibodaux, Louisiana. After the visit, Clorox decided to conduct a blind test comparison between Omnitech's Dr. X product and Raid Max, an industry leader. To facilitate the blind test, the parties executed a letter of understanding dated June 16, 1989 (the "letter of understanding") in which Omnitech agreed that, for a period of thirty days after the results of the blind tests were received, Omnitech would not enter into any contracts which could interfere with Omnitech's ability to grant Clorox a fifteen-year license for the distribution of Dr. X. Pursuant to the letter of understanding, Clorox conducted the blind tests, and the Dr. X product measured favorably against Raid Max.

Clorox and Omnitech continued negotiations with respect to Omnitech's business and assets, including its rights in Dr. X. However, on July 31, 1989, unbeknownst to Clorox, Omnitech sold to Ogden Laboratories, Inc. ("Ogden") "all the rights and actions of warranty ... [to] [t]he entire Dr. X product line, including, but not limited to, all roach sprays and other insecticides, whether such product line is presently existing or is developed in the future," in consideration of the sum of $539,000. The agreement further provided that Omnitech would "retain the exclusive rights to be the sole manufacturer and distributor of the entire Dr. X product line, including, but not limited to, all roach sprays and other insecticides, whether such product line is presently existing or is developed in the future...."

C. The Parties' Agreements

Clorox and Omnitech continued to negotiate a potential purchase of Omnitech's assets, which led to the execution of a non-disclosure agreement between the parties, the final version of which was dated November 30, 1989 (the "non-disclosure agreement"). The non-disclosure agreement was originally intended to be executed by Omnitech, Clorox, Peachtree Creek Business Group ("Peachtree"), an insecticide consultant, PSL Marketing Resources, Inc. ("PSL"), a marketing firm,[3]

---

[3]Peachtree and PSL were independent consultants, which were retained and paid by Clorox under separate agreements. Omnitech had no relationship with either of these consultants.

and Seabright.[4]

The non-disclosure agreement stated its purpose as being "to share non-public information defined below as "Confidential Information' relating to the evaluation of the "Doctor X' insecticide product and other products in the insecticide product category for the purposes of development and marketing of such products." Clorox representatives testified that they wanted the agreement to protect the confidentiality of Clorox' interest in the insecticide category. Omnitech also wanted the agreement to protect its proprietary information regarding Dr. X. The non-disclosure agreement thus provided, in pertinent part, that:

> Each [non-disclosing party] agrees to treat all Confidential Information provided by a [disclosing party] as trade secrets which shall not be disclosed to any one other than a non-disclosing party's employees or agents who have a need to know in order to complete assigned responsibilities. Each non-disclosing party also agrees to take all reasonable measures to guard against the unwarranted use or disclosure of any information ("Confidential Information") received by a non-disclosing party during all discussions and negotiations relating to the evaluation of the "Doctor X" insecticide product and other products in the insecticide product category for the purposes of development and marketing of such products.

The non-disclosure agreement also provided Clorox with an opportunity to terminate its relationship with Omnitech as follows:

> In the event that Clorox, based upon the evaluation by the parties hereto of the "Doctor X" insecticide product and other products in the insecticide product category, decides in writing not to continue to participate in the development and marketing of such products, then each party to this Agreement agrees to maintain the confidentiality of any Confidential Information disclosed by a party pursuant to this Agreement....

At the same time, Clorox and Omnitech executed a letter of intent (the "letter of intent"), which, among other things, gave Clorox a right of first refusal to purchase the assets of Omnitech. Pursuant to the letter of intent, from the November 30, 1990, date of execution through August 31, 1990, Clorox was to license all trademarks relating to Dr. X on a non-exclusive basis "in order to conduct laboratory and/or mini-market test marketing of the Doctor X product in certain stores and geographic areas selected by Clorox." During this same period, Omnitech was restricted from expanding its marketing areas in grocery stores and its marketing accounts in mass merchandise

---

[4]By the time the non-disclosure agreement was executed, however, Clorox had determined that Seabright's product was not commercially viable, and Seabright was thus excluded from the final agreement.

stores. However, Omnitech was allowed to continue marketing Dr. X to grocery stores in the same geographic areas in which the product was already being marketed and could continue to service the mass merchandise store accounts to which it had previously marketed its wares. Omnitech could also expand its marketing efforts in hardware stores "in any geographic area of the United States and its territories."

The letter of intent further granted Clorox "an exclusive option and the right of first refusal to purchase all trademarks relating to the Doctor X product and/or to purchase the business and all of the assets of Omnitech on terms mutually agreed to by the parties...." This option was to expire on December 31, 1990.

Clorox paid Omnitech $100,000 in cash for the non-exclusive license and test marketing. As further consideration for the letter of intent agreement, Clorox was to "guarantee a secured line of credit with a mutually-agreed to financial institution of up to two million five-hundred thousand dollars ($2,500,000) to fund working capital necessary to Omnitech's continuing operations." The letter of intent also required Omnitech to secure this line of credit with its current receivables.[5] In accordance with these terms, Omnitech executed a $2.5 million note with First Wachovia ("Wachovia"), for which Clorox gave a corporate guaranty, on February 14, 1990.[6]

Under both the non-disclosure agreement and the letter of intent, Clorox was obligated to give Omnitech all "mutually agreed to" marketing information that it generated in connection with the investigation and evaluation of Omnitech. One of the anticipated studies was a marketing test in a simulated test market, which was referred to at trial as a "STM." Although extensive preparations were made—and in fact the product was packaged by, and purchased from, Omnitech for the

---

[5]For some reason—which is hotly contested by the parties and not critical to the resolution of the issues presented—the security agreements to pledge the Omnitech receivables to the lender were never finalized or executed.

[6]At closing argument, Omnitech vigorously contended, in support of its trade practices claim, that Clorox unfairly forced Omnitech to use Wachovia—a national bank which had extensive relations with Clorox—rather than certain local banks with whom Omnitech had previously dealt. Clorox counters that it wanted to avoid "buddy" banks which might not deal with Omnitech on an arms-length basis. Moreover, Clorox argues, Wachovia gave more lenient terms to Omnitech than did the local banks and did not require Omnitech's shareholders to give personal guaranties.

test—Clorox never completed the study.

D. Combat Enters the Picture

Soon after Omnitech executed the $2.5 million note with Wachovia, American Cyanamid announced the sale of its Shulton Division in the *Wall Street Journal* via public auction. The Shulton Division marketed and distributed, among other products, Pine-Sol cleaners and Combat insecticides. Clorox was apparently quite interested in both products. On February 23, 1990, Clorox requested an offering memorandum and confirmation agreement from American Cyanamid, and subsequently made a non-binding bid to purchase the Shulton Division on April 14, 1990. Omnitech learned of Clorox' interest in bidding for the Shulton Division in February 1990, but claims that Clorox repeatedly assured Omnitech that the potential acquisition would not have any negative impact upon Clorox' evaluation and/or production of the Dr. X product. According to Omnitech's president, Fred Cortes ("Cortes"), when he contacted Clorox's manager of business development, Mike Scisco ("Scisco"), after the sale, Scisco assured him that Omnitech and its personnel "were the luckiest people around because now [Clorox was] in the insecticide business." According to Cortes' account, Scisco represented that Clorox felt that it now had the best aerosol on the market in Dr. X Roach Spray, and the best roach trap on the market in Combat.

Meanwhile, however, Clorox continued to postpone the Omnitech STM. On June 20, 1990, Clorox announced that it had won the bid to purchase the Shulton Group from American Cyanamid. Clorox claimed that, in acquiring the Shulton Division, it accomplished its "longstanding goal to acquire Pine-Sol, the number-one brand of household cleaners in the United States and to enter the insecticide category with an effective and marketable bait trap technology." Omnitech, reading the handwriting on the wall, pushed for commitments from Clorox, including, alternatively, a bid for packaging the Combat products. Clorox informed Omnitech that the Dr. X evaluation, including the STM, had been put on indefinite hold due to the Shulton acquisition.

E. The Breakdown of Negotiations

On July 18, 1990, Scisco met with Cortes, John Gohres, Sr., one of Omnitech's principal shareholders, and Steve Hill ("Hill") of Hill and Associates, an independent marketing consultant

retained by Omnitech, to inform them that Clorox would not be in a position to make any commitments to Omnitech until it had time to assess the impact of the Combat acquisition. The next day, Tony Biebl ("Biebl") of Clorox informed the Omnitech representatives that Clorox would not be going forward with any purchase, claiming that Omnitech did not fit into Clorox' plan. Biebl apparently represented that this decision resulted from its investigation of Dr. X and Omnitech. Clorox claims that the following findings and determinations were the basis for the decision: (1) a manufacturing run of Dr. X resulted in the cans substantially leaking; (2) Omnitech did not have the in-house capability to provide the necessary stability data, quality control, and efficacy tests required by Clorox's due diligence investigation; (3) Omnitech did not have the technological expertise to create an insecticide that would not be easily duplicated by competitors; and (4) Dr. X was a weak product with no track record.

Clorox offered to continue its guaranty of the Wachovia line of credit in accordance with the letter of intent and to assist Omnitech in completing the STM, which would require approximately $100,000 to $150,000 to complete. Omnitech rejected both offers and filed the instant action against Clorox on August 13, 1990, less than one month after Clorox announced that it would not go forward.

After communications broke down, Clorox contacted Wachovia to inform the banking officers of the deterioration of the parties' relationship. By then, Omnitech had drawn down the line of credit almost $800,000. At that time, Clorox learned that Omnitech had had difficulties in payment of the amounts due under the note. On September 19, 1990, Clorox purchased the Omnitech note from Wachovia and subsequently made demand upon Omnitech for repayment.

F. The Instant Litigation

Based upon the parties' dealings as described above, Omnitech asserted claims against Clorox for (i) breach of contract, (ii) detrimental reliance, (iii) violations of the Louisiana Trade Secrets Act, LA.REV.STAT.ANN. § 51:1431 *et seq.* (the "Trade Secrets Act"), (iv) wrongful taking pursuant to Articles 526, 2301, and 2312 of the Louisiana Civil Code, (v) breach of fiduciary duty, and (vi) violations of the Louisiana Unfair Trade Practices and Consumer Protection Law, LA.REV.STAT.ANN.

§ 51:1401 *et seq.* ("LUTPA"). Clorox counterclaimed for repayment of the note assigned to it by Wachovia, and for other damages, alleging that Omnitech (i) had failed to perform several of its obligations under the parties' contracts, (ii) had breached the non-disclosure agreement by disclosing Clorox's interest in the insecticide category to its creditors and banks, (iii) had made fraudulent and negligent misrepresentations to Clorox, and (iv) had generally violated the LUTPA in its business dealings with Clorox. Clorox also defended the claims against it, asserting, *inter alia,* that Omnitech did not own the rights that were the subject of and consideration for Clorox's execution of the non-disclosure agreement and the letter of intent and had already received almost $1 million from Clorox.

At trial, the court determined that Omnitech failed to present evidence to support its claims for misappropriation of trade secrets, wrongful taking, breach of contract, detrimental reliance, and breach of fiduciary duty. Accordingly, the district court granted Clorox a directed verdict on all of Omnitech's claims except the claim that Clorox violated the LUTPA.[7] The court also entered a directed verdict in favor of Clorox on its counterclaim for the sum due under the promissory note, but dismissed its other claims against Omnitech. Omnitech's LUTPA claim went to the jury, which found Clorox liable and awarded Omnitech $3.5 million in damages. Consequently, the district court entered judgment in favor of Omnitech for that amount, together with interest, attorneys' fees, and costs. The court also entered judgment awarding Clorox $782,480 on its counterclaim, together with interest and attorneys' fees, and granted Clorox's motion to set off the awards. The determination of the amount of attorneys' fees and related costs to be recovered by Omnitech on its LUTPA claim was referred to the court's magistrate, and the district court adopted magistrate's report and recommendation assessing Omnitech's attorneys' fees at $361,653.46.

## II. Analysis

Omnitech appeals from the district court's grant of Clorox' motion under Federal Rule of Civil Procedure 50 for judgment as a matter of law ("Rule 50") on its claims for misappropriation of trade

---

[7]Omnitech appeared to have abandoned the wrongful taking claims, and the issue is not preserved for appeal.

secrets, breach of contract, detrimental reliance, and breach of fiduciary duty, as well as from the trial court's calculation of the attorneys' fees awarded. Omnitech also appeals the district court's ruling which excluded certain expert testimony as to one of Omnitech's theories of damages, as well as its denial of Omnitech's motion for new trial on that issue. Finally, Omnitech requests a new trial based upon its view that the jury's award of $3.5 million in actual damages was so low under the circumstances as to warrant a new trial.

Clorox cross-appeals from the district court's judgment in favor of Omnitech and from the court's order denying its Rule 50 motion for judgment as a matter of law on the LUTPA claim. Clorox contends that the trial evidence was insufficient to support a claim under the LUTPA and that the jury's verdict was sufficiently excessive to warrant a remittitur. We first address the propriety of the district court's grant of Clorox' motion under Rule 50 on the misappropriation of trade secrets, breach of contract, detrimental reliance, and breach of fiduciary duty counts.

A. Judgment as a Matter of Law on the Majority of Omnitech's Claims

### 1. Standard of review

A motion for judgment as a matter of law is reviewed *de novo* by this court, applying the same legal standard as did the trial court. *Roberts v. Wal-Mart Stores, Inc.,* 7 F.3d 1256, 1259 (5th Cir.1993). In evaluating such a motion, formerly referred to as a motion for directed verdict, the court is to view the entire trial record in the light most favorable to the non-movant and draw all inferences in its favor. *Becker v. PaineWebber, Inc.,* 962 F.2d 524, 526 (5th Cir.1992). If the evidence at trial points so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion, this court will conclude that the motion should have been granted. *See* Fed.R.Civ.P. 50(a); *Resolution Trust Corp. v. Cramer,* 6 F.3d 1102, 1109 (5th Cir.1993). The "decision to grant a directed verdict ... is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury." *In re Letterman Bros. Energy Sec. Litig.,* 799 F.2d 967, 972 (5th Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987) (citing *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.,* 630 F.2d 250, 269 n. 22 (5th Cir.1980)). Keeping these standards in mind, we

review the district court's treatment of Omnitech's claims.

## 2. Misappropriation of Trade Secrets

The trial court granted Clorox' Rule 50 motion on Omnitech's trade secrets claim, finding that "clearly Omnitech did not own any trade secrets, did not own Dr. X at the time they signed the agreement.... Omnitech had transferred [any trade secrets] to Ogden and they did not own them and under the law you must have an interest to enforce a right."[8]  The district court was correct in resolving this claim as a matter of law.  However, we affirm its resolution of this issue on different grounds.  Even if we assume (without deciding) that Omnitech has standing to assert claims for all of the "trade secrets"[9] in this case, we hold that the record does not contain legally sufficient evidence of misappropriation by Clorox of the information provided by Omnitech.[10]

"Misappropriation," under the circumstances presented, is statutorily defined as the "*disclosure* or *use* of a trade secret of another without express or implied consent by a person who ... at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was ... acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use...."  LA.REV.STAT.ANN. § 51:1431(2)(b)(ii)(bb) (emphasis added).  All of Omnitech's witnesses conceded that they had no evidence of Clorox having "disclosed" any of Omnitech's confidential information

---

[8]Although there was testimony that Omnitech would have been able to deliver the trade secrets and other Dr. X-related assets in order to consummate a deal with Clorox, there was no evidence that Omnitech owned these secrets at the time of their disclosure.  The undisputed evidence proves that Omnitech sold all of its Dr. X assets to Ogden in exchange for a sizeable sum of cash *prior* to its execution of the non-disclosure agreement and letter of intent.  (The record also reflects that none of the Omnitech principals disclosed this fact to Clorox.)  Thus, there is some question (which we do not decide) as to whether Omnitech had standing, as a non-owner, to make out a misappropriation claim.

[9]For purposes of this analysis, we will also assume, without deciding, that the information conveyed to Clorox did in fact constitute "trade secrets."

[10]To sustain an action for misappropriation of trade secrets under Louisiana law, a plaintiff must show (i) the existence of a legally protectable trade secret, (ii) misappropriation of the trade secret, and (iii) damages resulting therefrom.  LA.REV.STAT.ANN. § 51:1431 *et seq.; Engineered Mechanical Services, Inc. v. Langlois,* 464 So.2d 329, 333 (La.Ct.App.1984), *writ denied,* 467 So.2d 531 (La.1985).  As noted above, we assume, without deciding, that the information conveyed to Clorox constituted legally protectable trade secrets for purposes of this discussion.  Thus, we turn our focus to the sufficiency of evidence supporting the other elements of Omnitech's trade secrets claim, noting that Omnitech bears the ultimate burden of establishing a legal basis upon which to predicate relief.  *Langlois,* 464 So.2d at 333.

to outside parties. Although some of Omnitech's witnesses made conclusory allegations that they believed Clorox would have had to have "used" Omnitech's proprietary information in evaluating the Combat purchase, these intuitions were not borne out by legitimate facts. The record shows that Omnitech conveyed its trade secrets to Clorox so that Clorox could "evaluat[e] the "Doctor X' insecticide product and other products in the insecticide product category for the purposes of development and marketing of such products." There is no evidence in the record that Clorox used the information for any other purpose. In fact, the only records that reflect information about both Combat and Omnitech clearly relate to Clorox' decision as to whether to integrate the two products. Omnitech's president, Cortes, conceded he was told that Clorox was investigating such a combination, and each of the witnesses confirmed that this was Clorox' intention in evaluating the two projects in tandem. In light of the fact that Clorox was not prohibited from evaluating and/or purchasing other insecticides while evaluating Dr. X—as will be further discussed below—Omnitech has simply failed to demonstrate that Clorox misused the information it transferred pursuant to the non-disclosure agreement. *See, e.g., Wright Chem. Corp. v. Johnson,* 563 F.Supp. 501, 505 (M.D.La.1983) (holding that plaintiff's failure to show that former employees actually disseminated or used confidential information rendered trade secrets claim fatally defective).

Moreover, Omnitech demonstrated that the trade secrets disclosed to Clorox included the Dr. X formulas, possible improvements and second and third generation products, Omnitech's plant configurations, production methods (including "line" and flow diagrams), packaging, quality control data and protection records (e.g., weights of propellants, leakage, concentrate levels, etc.), and cost of goods produced.[11] Clorox' witnesses expressly testified that the Omnitech information was not used in assessing the Combat acquisition—specifically demonstrating that (i) Combat was

---

[11]Most of this information was conveyed to Clorox *prior* to American Cyanamid's announcement of the Shulton sale. There is no evidence in the record that Clorox had knowledge of the impending sale of the Shulton Division before the *Wall Street Journal* announcement in February of 1990, approximately three months after the non-disclosure agreement was executed. Omnitech gave Clorox the majority of the proprietary information at issue before or shortly after the non-disclosure agreement was signed. Thus, it is simply implausible for Omnitech to assert that Clorox purchased the right to view Omnitech's trade secrets purely for its education so that it could assess a future purchase of Combat.

predominately a "bait trap" business, (ii) the Combat aerosols were manufactured and packaged by outside companies, (iii) American Cyanamid conveyed so much of its own information about the Combat product line that it was "like drinking from a fire hose," (iv) Clorox already had in its possession extensive knowledge about aerosol production-line technology since it manufactured aerosols in its cleaning products divisions, and (v) Omnitech's information as to the manufacture and packaging of aerosols was therefore irrelevant to Clorox' decision. This evidence was not refuted. Although there are some documents with references both to Combat and to Dr. X or Omnitech, these documents clearly reflect an attempt by Clorox to determine whether the Dr. X products would fit in with the Combat line.

Further, there is absolutely no evidence that Clorox took the information received from Omnitech and tried to implement it in the recently-acquired Combat product line. Conspicuously absent from the record is any evidence that Clorox used the information to obtain any trade advantage. Even Omnitech concedes—as it must—that the only "misuse" by Clorox was in attempting to evaluate Combat and Dr. X together. Clorox' representatives, on the other hand, testified they had no plans to change the Combat aerosol formulas—which are decidedly different from Dr. X—and that they had been seriously considering eliminating the aerosol line altogether since those products were fast becoming obsolete.

Finally, the timing of the transactions belies Omnitech's protest of late that Clorox "misused" its trade secrets in analyzing a potential integration of Dr. X with Combat. It is undisputed that Omnitech continued to share some of its trade secrets with Clorox *after* Clorox' interest in the purchase of Combat became known to Omnitech.[12] The parties also agree that Clorox told Omnitech

---

[12]Specifically, George Capiton ("Capiton"), Omnitech's Director of Manufacturing, testified that he continued to give Clorox information after February of 1990, when the parties stipulated that Clorox began pursuing Combat. Omnitech's president, Cortes, learned of Clorox' interest in purchasing the Shulton Division in February 1990, at the time the article in the *Wall Street Journal* was run. In a telephone conference with Cortes, Scisco confirmed that Clorox was "of course, ... going to look at" a potential purchase of Combat, although both parties understood the speculative nature of bidding for a company at public auction.

that it was hoping to integrate the Omnitech aerosol and the Combat bait traps.[13]  Omnitech made no protest to Clorox' efforts and continued to provide information for Clorox' evaluation of Dr. X.  In short, Clorox made full disclosure to Omnitech that it was contemplating a purchase of Combat and that an acquisition of Combat would not affect Clorox' interest in Omnitech since the two companies specialized in different, but complementary, insecticide products.  Omnitech continued to go forward with Clorox.  Thus, Omnitech cannot be heard to claim that Clorox "misused" its proprietary information to evaluate a possible purchase of both companies.

At best, and as Omnitech conceded at oral argument, Omnitech claims that its trade secrets made Clorox "smarter" about the market in investigating the potential Combat purchase.  Certainly "misappropriation" of a trade secret means more than simply using knowledge gained through a variety of experiences, including analyses of possible target companies, to evaluate a potential purchase.  To hold otherwise would lead to one of two unacceptable results:  (i) every time a company entered into preliminary negotiations for a possible purchase of another company's assets in which the acquiring company was given limited access to the target's trade secrets, the acquiring party would effectively be precluded from evaluating other potential targets;  or (ii) the acquiring company would, as a practical matter, be forced to make a purchase decision without the benefit of examination of the target company's most important assets—its trade secrets.

We believe that Louisiana's trade secrets laws were not designed to go this far.  Rather, the Louisiana Trade Secret Act is an outgrowth of, and has its basis in, Louisiana's unfair trade practices law.  *See, e.g., Engineered Mechanical Services, Inc. v. Langlois,* 464 So.2d 329, 333 (La.Ct.App.1984), *writ denied,* 467 So.2d 531 (La.1985) (noting that, prior to the adoption of the Trade Secrets Act, trade secrecy protection was provided for in the LUTPA).  The fundamental basis of trade secret law is to protect the "[o]ne who has a trade secret [who] may be harmed merely by the disclosure of his secret to others as well as by the use of his secret in competition with him." RESTATEMENT OF TORTS § 757, comment c (1939).  The purpose of the Trade Secrets Act is "to

---

[13]Indeed, one of Omnitech's theories of detrimental reliance, as discussed *infra,* is that Clorox told Omnitech it would bring Omnitech into the national market with Combat, if Clorox were in fact able to purchase the Shulton Division.

prevent one [person] or business from profiting from a trade secret developed by another, because it would thus be acquiring a free competitive advantage." *Stork-Werkspoor Diesel V.V. v. Koek,* 534 So.2d 983, 985 (La.Ct.App.1988) (holding that the Louisiana Trade Secrets Act was "[not] intended to apply to discovery [requests]" in a tort action for negligent design). Thus, we hold that to sustain a trade secrets action under the "use" prong of the statutory definition of "misappropriation," a plaintiff must necessarily demonstrate that the defendant received some sort of unfair trade advantage. As will be discussed in greater detail in section II-B of this opinion, Omnitech has wholly failed to demonstrate that Clorox gained any competitive edge in the insecticide marketplace as a result of any trade secret of Omnitech. *Cf. Sikes v. McGraw Edison Co.,* 665 F.2d 731, 735 (5th Cir.), *cert. denied,* 458 U.S. 1108, 102 S.Ct. 3488, 73 L.Ed.2d 1369 (1982) (Where plaintiff demonstrated a device to defendant pursuant to a similar non-disclosure agreement and defendant subsequently began marketing a remarkably similar product after negotiations fell through, evidence was sufficient to support a claim under Texas trade secrets law). Consequently, Omnitech's trade secrets claim fails for the reason that there was insufficient evidence as a matter of law that Clorox improperly disclosed or used any of Omnitech's confidential or proprietary information.[14]

### 3. Breach of Contract

At trial, Omnitech claimed that Clorox breached express terms of the parties' written agreements and additionally breached certain oral agreements and/or oral modifications to the letter of intent and non-disclosure agreement. We review each of these classes of claims separately.

### a. Obligations under the written agreements

Omnitech introduced testimony that its principals believed the letter of intent and non-disclosure agreement bestowed upon Clorox the following duties, all of which were allegedly breached: (i) to negotiate in good faith for the purchase either of Omnitech or of the Dr. X product

---

[14]We do not mean to preclude, however, a trade secrets action in every situation where an acquiring company gains access to a potential target's trade secrets and subsequently acquires a competitor since there very well may be situations which could constitute actionable misappropriation under Louisiana law. We hold only that, in the instant case, there is no evidence that Clorox misappropriated any trade secrets of Omnitech, since there is no evidence that Clorox gained an unfair trade advantage over Omnitech by virtue of the information Clorox received.

line;  (ii) to complete the STM and other marketing analyses for the Dr. X product as contemplated in the attachment to the parties' non-disclosure agreement;  and (iii) not to enter the insecticide category if the joint venture with Omnitech failed to be consummated.  The district court directed a verdict on each of these theories, finding that the unambiguous terms of the written contracts did not convey any such duties upon Clorox:

> [i] A reading of the letter of intent makes it clear that Clorox was purchasing an option to the right of first refusal to purchase Omnitech's business on mutually acceptable terms to be agreed upon in the future.  There was no contract for the purchase of the business in any way ...[;]
>
> [ii] [T]he contracts provided, when read in their entirety, ... that Clorox was to furnish the results of all testing of the Dr. X product to Omnitech, but assumed no obligation to do the specific testing, and that includes the STM ...[;]  and
>
> [iii] [T]here is absolutely nothing in either the letter of intent or the non-disclosure agreement that could be construed as a non-compete agreement by Clorox....

The district court necessarily determined that the written contracts were not ambiguous, and, under Louisiana law, "when the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA.CIV.CODE ANN. art. 2046; *see also Fontenot v. Waste Management of Lake Charles, Inc.,* 493 So.2d 904, 907 (La.Ct.App.1986).  This established rule of strict construction does not allow the parties to create an ambiguity where none exists and does not authorize courts to create new contractual obligations where the language of the written document clearly expresses the intent of the parties.  *Kennedy v. Sanco Louisiana, Inc.,* 573 So.2d 505, 507 (La.Ct.App.1990), *writ denied,* 578 So.2d 138 (La.1991). Where, as here, the contract can be interpreted from the four corners of the document, without resort to extrinsic evidence, the interpretation of the contract is a matter of law, reviewed by this court *de novo.  Rutgers v. Martin Woodlands Gas Co.,* 974 F.2d 659, 661 (5th Cir.1992) (applying Louisiana law).  With these principles in mind, we turn to the language of the contracts in the instant case.

As noted above, the letter of intent expressly grants Clorox "an exclusive option and the right of first refusal to purchase all trademarks relating to the Doctor X product and/or to purchase the business and all of the assets of Omnitech...."  It additionally provides that "*Omnitech* further agrees that it shall begin to negotiate in good faith within sixty (60) days of the execution of this Agreement

to come to mutually-agreed to terms and conditions of this option." We find these terms to be unambiguous and cannot read them to create any contractual obligation on *Clorox'* part to negotiate further for the purchase either of Dr. X or of Omnitech.

With respect to the STM, we also agree with the district court that Clorox was under no obligation to perform the test. The letter of intent's reference to "mutually-agreed-to marketing information" merely defines this term as constituting the information "more fully described in Addendum # 1 to the Non-Disclosure Agreement" and states that Omnitech "shall receive" this information. The non-disclosure agreement similarly provides that Omnitech will be allowed "to use all mutually agreed to marketing information as defined and described in Addendum 1" in the event that Clorox decides "not to continue to participate in the development and marketing of [the Dr. X and/or Seabright] products." Addendum # 1 lists "data that *may* be generated from [the] Market Test." To read the agreements as does Omnitech—i.e., requiring Clorox to perform the STM—would violate Louisiana's rule that contracts are to be interpreted in light of all of their provisions, "so that each provision is given the meaning suggested by the contract as a whole." *Fontenot,* 493 So.2d at 907. If we read the written agreements between Omnitech and Clorox as a whole, we come to the inescapable conclusion that Clorox was not obligated to generate any marketing data, but that, if the information described in Addendum # 1 were developed, Clorox would be duty-bound to give it to Omnitech.[15] "Certainly nothing absurd results from reading the

---

[15]Omnitech claims that the contract was ambiguous on this obligation and that its parol evidence established that Clorox had a duty to conduct the STM. Consequently, it concludes, the interpretation of this agreement was for the jury to decide. Omnitech argues that "once a trial court has admitted parol evidence on the terms of the contract, the question of interpretation becomes a factual one for the jury." This position has no merit. First, the parol evidence to which Omnitech alludes does not establish that Clorox had an affirmative duty to conduct the STM. Rather, the cited testimony of Biebl and Scisco relates to the respective obligations of the parties *if* the test were undertaken. In other parts of the transcript, Biebl and Scisco both specifically testified that there was no agreement to conduct the STM. Further, and as discussed above, the unequivocal terms of the contract in this respect preclude any need for the jury to interpret the contract. Finally, and most importantly, we do not read the cases cited by Omnitech to support a rule that the trial court's decision to admit parol evidence conclusively determines whether the issue of interpretation must go to the jury. In *Agfa-Gevaert, A.G. v. A.B. Dick Co.,* 879 F.2d 1518, 1521-22 (7th Cir.1989), Judge Posner enunciated an evolving interpretation of the parol evidence rule that the jury should decide "the meaning of the contract in all cases in which that meaning has for any reason been fairly drawn into doubt." The other two cases, *Dime Box Petroleum Corp. v. Louisiana Land and Exploration Corp.,* 717 F.Supp. 717, 720

contract as if the parties intended the plain meaning of the words they used." *Rutgers,* 974 F.2d at 662.

Concerning the third alleged duty, we find that the unambiguous terms of the written contracts do not evidence any agreement between the parties not to compete. Omnitech's president conceded as much when he agreed at trial that there was "no agreement between Omnitech and Clorox which prevented Clorox from investigating the purchase of another brand of insecticide" and that he was "not aware of any agreements that prevented Clorox from actually purchasing another brand of insecticide." Since the district court was correct in concluding that none of the duties described above was created by the executed contracts, it properly granted judgment as a matter of law with respect to these claims.

Omnitech additionally contends that Clorox breached its express contractual agreement not to disclose or make any "unwarranted use" of its confidential information. For the reasons discussed above in section II-A-2, we agree with the district court's disposal of this claim, holding that Clorox did not make "unwarranted use" of any of Omnitech's proprietary information as a matter of law.

Finally, Omnitech argues that Clorox is liable under the written agreements for its failure to return all of Omnitech's confidential information "without retaining any copies or extracts thereof" and to destroy all of its own documents prepared by its own employees or agents "in whole or in part from any Confidential Information" of Omnitech. This claim is also wholly without merit in light of the fact that this lawsuit was filed almost immediately after Clorox notified Omnitech in writing—as required by the non-disclosure agreement—that it would not pursue Dr. X or Omnitech further. Moreover, Omnitech concedes that it received all of the information at issue during the course of this litigation and cannot show that it suffered any damages as a result of failing to receive the materials earlier.

---

(D.Colo.1989), *aff'd,* 938 F.2d 1144 (10th Cir.1991), and *Eastline Corp. v. Marion Apartments, Ltd.,* 524 So.2d 582, 584 (Miss.1988), involve, respectively, Colorado's and Mississippi's treatment of oral modifications to written contracts. In both of those cases, the circumstances required that the oral modification claim be decided by the jury. Here, the contracts were found to be unambiguous as a matter of law and thus there was no issue for the jury to decide. *Rutgers v. Martin Woodlands Gas Co.,* 974 F.2d 659, 661 (5th Cir.1992).

b. Parol evidence as to alleged oral agreements and/or modifications

Omnitech also put forth breach of contract theories based upon alleged oral representations and subsequent oral modifications to the parties' agreements, contending that the district court, in dismissing Omnitech's breach of contract claim, "overlooked substantial evidence before the jury that the Letter of Intent was not the only contract between the parties, and that it did not encompass all of the contractual commitments between Clorox and Omnitech." Specifically, Omnitech alleges that Clorox executives Biebl and Scisco made oral promises that Clorox would not enter the insecticide category without Omnitech and that such promises were contractually binding. In the district court's view, any oral agreement of this type was precluded by the merger clause because the provision (i) accurately reflected the entire spectrum of the parties' agreement as of the date of execution, and (ii) defined the agreed-upon means by which the parties' contractual obligations could be modified.[16]

The written agreements between the parties include an express integration clause, reflecting that the entire agreement between the parties had been reduced to writing in those instruments and that it can be modified only "by written agreement executed by authorized representatives of the parties hereto."[17] While we by no means interpret the merger clause, *per se,* to preclude any parol evidence as to other possible agreements and/or representations between the parties, the facts of the instant case compel a conclusion that the merger clause correctly reflected the parties' intentions and

---

[16]As the district court noted, although all of the preliminary negotiations were conducted by Scisco:

> when the time came to put down an agreement, pass money, consideration, and things of that type, I don't know who, but a vice president signed it, not Seisco [sic]. And then I don't see how any reasonable person under the circumstances could be heard to say, and the agreement provided that changes can only be made in writing, ... that Seisco [sic] can now change the terms or add to or make an additional agreement.... But [Omnitech could not] overcome the prohibition in the contract itself.... If [Omnitech] relied upon [Scisco's representations], they had no right to do that as such because there was no agreement, in the view of the Court.

[17]That provision, contained in the letter of intent, reads as follows:

> This Letter of Intent contains the entire agreement of the parties, hereto, and supersedes all prior agreements and understandings, written and oral, with respect to the subject matter hereof, with the exception of the Non-Disclosure Agreement, as described herein and incorporated herein by reference. It may only be modified by written agreement executed by authorized representatives of the parties hereto.

should thus be enforced as written. *See, e.g., Johnson v. Orkin Exterminating Co., Inc.,* 746 F.Supp. 627, 633 (E.D.La.1990). First, Omnitech was represented by its own counsel, who apparently negotiated quite vigorously on its behalf. In fact, the negotiations between Omnitech and Clorox had been on-going since February of 1989, at which time Omnitech, presumably on advice of counsel, rejected Clorox' original proposed non-disclosure agreement, since it did not adequately protect Omnitech's proprietary information. Subsequent drafts of the agreement were hotly disputed, and Omnitech's input was quite apparent in the final agreement. For example, Omnitech demanded, and was given, a concession that it be able to retain its current market shares of the Dr. X product by limiting the license granted to Clorox both categorically and geographically. Omnitech was both capable and successful in protecting its position.

Further, the record demonstrates that Omnitech was quite aware that Clorox was investigating an array of options with respect to the insecticide industry. By the time of the parties' first contact, Clorox had already investigated several other companies and had conducted its own in-house research to determine the best way for it to enter the market. Indeed, one of its prospects, Seabright, was intended to be included as a signatory to the non-disclosure agreement subsequently executed by the parties. Clorox' interest in other products in the insecticide category therefore was known to Omnitech at the time the contracts were executed.

Finally, although Cortes himself testified that his purpose for the non-disclosure agreement was that Clorox "would not compete against us," it hardly seems possible that his "understanding" would not have been so recorded when other, more minor agreements were carefully included. In light of these circumstances, it is difficult to believe that Omnitech somehow "overlooked" or "presumed" an understanding it now professes to be a critical part of the parties' agreement—i.e., that Clorox promised not to enter the insecticide category or market without Omnitech.

With respect to subsequent oral modifications to the agreements, the only evidence of record is testimony that Scisco repeatedly assured Omnitech representatives that Clorox was committed to make Omnitech a part of any venture into the insecticide market. We agree with the trial court that Omnitech could not have reasonably believed Scisco had the authority to amend the parties'

agreements when it was clear to Omnitech, as conceded by its president at trial, that Scisco did not have the authority to bind Clorox.[18] *See, e.g., Tedesco v. Gentry Dev. Corp., Inc.,* 540 So.2d 960, 963 (La.1989) ("[A]pparent authority operates only when it is reasonable for the third person to believe the agent is authorized and the third person actually believes the agent is authorized."). Therefore, the trial court properly removed this claim from the jury.

### 4. Detrimental Reliance

In a related part of its order, the district court granted judgment as a matter of law on Omnitech's detrimental reliance claim. In doing so, the court noted that the agreement between the parties had been reduced to writing and held that it was unreasonable for Omnitech to contend "that [Scisco could orally] change the terms or add to or make an additional agreement," since "the agreement provided that changes can only be made in writing."

The elements of a cause of action for detrimental reliance are (i) a promise made (ii) by one who knows or has reason to know (iii) that the promise will induce the other party to rely, (iv) to his detriment, (v) provided the reliance is reasonable. LA.CIV.CODE ANN. art. 1967; *see also Morris v. Peoples Bank & Trust Co.,* 580 So.2d 1029, 1033-34 (La.Ct.App.), *writs denied,* 588 So.2d 101-02 (La.1991). In its brief, Omnitech states that it relied upon Clorox' "repeated assurances that it would include Omnitech in any venture into the insecticide market." The focus of this inquiry in the case presented is upon the reasonableness of Omnitech's professed reliance[19] upon alleged

---

[18]Although Omnitech points to the testimony of its consultant, R. Patrick Hill, to support its contention that Biebl orally modified the parties' written contracts, the transcript reflects that the statements attributed to Biebl were made at the time the parties executed the non-disclosure agreement. Thus, they must be analyzed in terms of the integration clause discussed above.

[19]There is some question as to whether Omnitech truly relied upon any alleged promise by Clorox not to enter the insecticide category without Omnitech. Omnitech lists five actions that it took in reliance upon Clorox' promise: (i) restricting its markets, (ii) giving Clorox confidential information, (iii) keeping several employees on the payroll solely to provide marketing and technical data to Clorox, (iv) delaying its promotional work for the Dr. X product, and (v) passing up several opportunities with other companies. However, Omnitech was under a contractual duty to undertake the first two deeds by virtue of the letter of intent and nondisclosure agreements it voluntarily executed. It cannot now claim that the performance of its contractual duties somehow evidences detrimental reliance upon promises outside the scope of those agreements.

Moreover, there is significant evidence that Omnitech acted as it did with respect to the remaining three actions or inactions because it had determined in its own business

representations that Clorox was binding itself to include Omnitech in any venture into the insecticide category that Clorox might endeavor.  We again note that such promises, if made, were outside the scope of the fully-integrated, written agreements between Omnitech and Clorox.  For the reasons described above, we refuse to look past the written terms of the agreements, and hold that the trial court did not err in finding that any reliance by Omnitech upon these representations was unreasonable as a matter of law.  Thus, we overrule this point of error.

## 5. Fiduciary Duty

To sustain a cause of action for breach of fiduciary duty under Louisiana law, Omnitech must first prove the existence of a fiduciary duty on the part of Clorox.  *Texasgulf, Inc. v. United Gas Pipe Line Co.,* 471 F.Supp. 594, 598 (D.D.C.1979) (applying Louisiana law).[20]  The trial court granted Clorox judgment as a matter of law on this claim, finding that Omnitech had "introduced absolutely no evidence ... that could possibly be construed as imposing a fiduciary duty on Clorox.  These were two companies making contracts that seem mutually accepted and providing objectives.  It couldn't possibly be construed in my view as having created a fiduciary relationship."  We agree.

To support its claim that Clorox owed it a fiduciary duty, Omnitech merely restates the misuse

---

judgment that a potential contract with Clorox was its best financial bet at that point in time.  At trial, Omnitech representatives testified that the company explored possible ventures with Dr. Tichenor and Colgate-Pamolive.  However, Cortes also acknowledged that he viewed an agreement with Dr. Tichenor to be inferior to one with Clorox since Clorox's marketing expertise was much more significant.  Further, Omnitech's representatives testified that any contract with Colgate would have taken much longer to confect because of Colgate's evaluation process and that Omnitech needed an investor or partner as quickly as possible.  Finally, the parties' agreements provided that Omnitech was to receive the benefit of any marketing data generated by Clorox with respect to the Dr. X products;  thus, as a practical matter, the longer Omnitech held on with Clorox, the more marketing data it would receive at Clorox' expense even if Clorox did not go through with a final purchase.  Indeed, Omnitech's second scenario of damages is premised upon Omnitech acquiring another partner after having the benefit of all of the marketing data contemplated to be generated by Clorox in the non-disclosure agreement.  In sum, the actions or inactions taken by Omnitech do not demonstrate reliance upon a promise that Clorox would not enter the insecticide category without Omnitech.

[20]The other elements of a breach of fiduciary duty claim are (ii) an action taken by Clorox in violation of that duty, and (iii) damages to Omnitech as a result of that action.  *Fed. Sav. & Loan Ins. Corp. v. Shelton,* 789 F.Supp. 1360, 1366 (M.D.La.1992).  A claim for breach of fiduciary duty requires "proof of fraud, breach of trust or an action outside the limits of the fiduciary's authority."  *Gerdes v. Estate of Cush,* 953 F.2d 201, 205 (5th Cir.1992).

of information and/or trade secrets allegations that it used in support of its misappropriation of trade secrets and breach of contract causes of action. Neither of these grounds is sufficient to create such a stringent duty. As a matter of Louisiana law, a contract, standing alone, does not impose any fiduciary duties upon the parties; rather, a party to a contract is required merely to make a good faith performance of that contract. *See Tahoe Corp. v. P & G Gathering Sys.,* 506 So.2d 1336, 1345 (La.Ct.App.1987). Moreover, the Trade Secrets Act claim cannot serve as the basis for a fiduciary duty claim since the Act itself supplants "conflicting tort, restitutionary, and other laws of this state pertaining to civil liability for misappropriation of a trade secret." LA.REV.STAT.ANN. § 51:1437; *see also McPhearson v. Shell Oil Co.,* 584 So.2d 373, 376 (La.Ct.App.1991). Thus, to the extent Omnitech's fiduciary duty claim is grounded in contract or trade secret allegations, it must fail as a matter of law.

Moreover, Louisiana courts have confined fiduciary duties to special relationships of trust and confidence, such as the following:

> [B]esides agency, there are other legal relationships that impose fiduciary duties on parties. A director or officer of a corporation owes a fiduciary duty to his corporation. LSA-R.S. 12:91.... Similarly, a partner owes a fiduciary duty to the partnership and to his partners.

*Tahoe,* 506 So.2d at 1344-45; *see also State of Louisiana v. Hagerty,* 251 La. 477, 205 So.2d 369, 374 (1967) (recognizing that one acts in a fiduciary capacity when he or she transacts business or handles money which is not his or her own or for his or her benefit), *cert. denied,* 391 U.S. 935, 88 S.Ct. 1848, 20 L.Ed.2d 855 (1968). A fiduciary relationship is also recognized between the following: attorney-client, insured-insurer, majority shareholder-minority shareholder, and outside salesman-employer. *See Cason v. Texaco, Inc.,* 621 F.Supp. 1518, 1526 n. 21 (M.D.La.1985). Omnitech recognizes that its relationship to Clorox does not fall into any of the recognized categories; however, it argues that a special relationship of trust and confidence was created by virtue of the confidential information it conveyed to Clorox. *See, e.g., Cloud v. Standard Packaging Corp.,* 376 F.2d 384, 388-89 (7th Cir.1967) (Where disclosure is made to further a relationship, a relationship of confidence may be implied, "e.g., disclosure to a prospective purchaser to enable him to appraise the value of a secret...."). The only "trust and confidence" Omnitech reposed in Clorox,

however, were its trade secrets, which, as discussed above, are actionable only under the Trade Secrets Act. Omnitech's reasoning in this regard is therefore circular.

Moreover, and in contrast to the confidential relationship necessary to create a fiduciary duty, the record in this case is replete with evidence that Omnitech and Clorox had only an arms-length business relationship,[21] including undisputed testimony that (i) the parties vigorously negotiated the agreements ultimately executed, (ii) both sides were represented by competent counsel in the drafting and consummation of the agreements, and (iii) Omnitech took measures to keep its financial information concealed from Clorox.[22] For all of these reasons, Omnitech failed to make out a colorable claim for breach of fiduciary duty, and the trial court properly adjudicated this claim as a matter of law.

## B. The District Court's Denial of Judgment as a Matter of Law on the LUTPA Claim

The only cause of action submitted to the jury was Omnitech's claim for unfair trade practices under the LUTPA. As Omnitech's counsel conceded at oral argument, the unfair trade practices claim was based upon the same facts undergirding its claims for misappropriation of trade secrets, breach of contract, detrimental reliance, and breach of fiduciary duty. Since each of those attempted causes of action was found wanting under Louisiana law, Clorox maintains that the trial court should have granted judgment as a matter of law on the LUTPA claim. *See American Waste and Pollution Co. v. Browning-Ferris,* 949 F.2d 1384, 1392 (5th Cir.1991) (The LUTPA "cannot apply to activity which is not actionable under Louisiana law."). Omnitech counters that any requirement that a LUTPA claim be predicated on another recognized cause of action under Louisiana law would render the statute superfluous. We need not resolve this issue, however, in the instant case because it does not appear that the "facts" proven by Omnitech at trial support a claim for unfair trade practices as a matter of law. The statute provides redress for "[u]nfair methods of competition and unfair or

---

[21]Although there is some testimony that Clorox personnel referred to the relationship as a partnership, there is no evidence that Omnitech and Clorox entered into a partnership relationship or joint venture.

[22]For example, Cortes testified that he was very careful about what financial information was given to Clorox because of his concern that the information would adversely affect Omnitech's bargaining abilities in negotiations with Clorox.

deceptive acts or practices in the conduct of any trade or commerce." LA.REV.STAT.ANN. § 51:1405(A). The real thrust of the LUTPA, modeled after the Federal Trade Commission Act, 15 U.S.C. § 45, is to deter injury to competition. *See, e.g., Federal Trade Comm'n v. Raladam Co.,* 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324 (1931) (construing the Federal Trade Commission Act).[23] In *Raladam,* the Supreme Court affirmed the reversal of a Federal Trade Commission cease and desist order because "there [was] neither finding nor evidence from which the conclusion legitimately can be drawn that these advertisements substantially injured or tended thus to injure the business of any competitor." Similarly, in the instant case, there is no evidence that Omnitech's ability to compete was injured by Clorox' actions. We find it difficult to say that Clorox' purchase of Combat put Omnitech in a different position in the market than it would have been if Clorox had merely decided not to purchase Omnitech. There is no evidence to suggest that Combat would not have been purchased by another bidder and thereby stayed in the market. Absent any showing that Clorox used Omnitech's trade secrets to better Combat's position in the marketplace or worsen Omnitech's, thus infringing upon competition, we cannot find a violation of the LUTPA.

We recognize that the Louisiana statute is deliberately broad and does not specify particular violations, since

> the definition of what may constitute an unfair act or practice is broad and subjective. Thus it is best that the determination of what may amount to an unfair act or practice remain province of the courts applied on a case by case basis.

*Roustabouts, Inc. v. Hamer,* 447 So.2d 543, 548 (La.Ct.App.1984). The Louisiana courts have, however, offered some limiting guidelines. Specifically, to establish that a defendant's business actions were "unfair," the plaintiff must demonstrate that they offended "established" public policy and were "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Monroe Medical Clinic, Inc. v. Hospital Corp. of America,* 522 So.2d 1362, 1365 (La.Ct.App.1988).

---

[23]The Louisiana courts have recognized the appropriateness of referring to federal interpretations when deciding unfair trade practices cases. *Roustabouts, Inc. v. Hamer,* 447 So.2d 543, 548 (La.Ct.App.1984) (quoting *Guste v. Demars,* 330 So.2d 123, 125 (La.Ct.App.1976)); *see also State ex rel. Guste v. Orkin Exterminating Co.,* 528 So.2d 198, 202 n. 3 (La.Ct.App.1988) ("Louisiana courts give great deference to determinations of unfair trade practices by the Federal Trade Commission.").

Thus, to recover under the LUTPA, Omnitech would have to "prove some element of fraud, misrepresentation, deception or other unethical conduct." *Dufau v. Creole Engineering, Inc.,* 465 So.2d 752, 758 (La.Ct.App.), *writ denied,* 468 So.2d 1207 (La.1985). The courts interpreting the LUTPA have been hesitant to impose liability where the evidence reveals merely a normal business relationship. *E.g., Monroe Medical,* 522 So.2d at 1365; *Turner v. Purina Mills, Inc.,* 989 F.2d 1419, 1422 (5th Cir.1993) (The LUTPA does not provide an alternative remedy for simple breaches of contract.). Conversely, where there exists evidence of fraud or specific intent to injure a competitor, the courts have been more willing to embrace the LUTPA. *See, e.g., Chemical Distrib., Inc. v. Exxon Corp.,* 1 F.3d 1478, 1485-86 (5th Cir.1993), (noting evidence of deception and specific jury finding of bad faith); *Roustabouts,* 447 So.2d at 549 (finding that the defendants exhibited "a clear intent to decimate the plaintiff's business for their own gain"); *Head v. Waggoner,* 552 So.2d 599, 604 (La.Ct.App.1989) (Although the trial court did not make a specific finding of fraud, court of appeals noted that the plaintiffs presented "ample evidence of fraud" by the defendant.); *Dufau,* 465 So.2d at 758 (finding that the defendant solicited and diverted business from former employer while still employed). As this court stated in *Turner,* the "LUTPA does not prohibit sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions." 989 F.2d at 1422 (citing *Monroe Medical,* 522 So.2d at 1365).

In the instant case, there is neither allegation nor evidence of fraud. The testimony and documentary evidence does not present a picture of deceptive activity but simply a case where Clorox entered into preliminary agreements to purchase Dr. X, subsequently deciding not to go further in the absence of any obligation to do so. Although Clorox eventually purchased a competitor of Omnitech's, the parties had never agreed that Clorox was forbidden from doing so. Moreover, the undisputed evidence reflects that the Combat purchase did not preclude purchase of the Omnitech products as well. Clorox' investigation of the possibilities of integrating the Combat and Dr. X products was neither precluded by the parties' agreements nor by ethical business practices.[24]

---

[24]Moreover, in light of the likelihood that Clorox would have purchased the Shulton Division for its Pine-Sol products, irrespective of the Combat line, it was not commercially unreasonable for Clorox to investigate the possibility of consolidating Combat—which would necessarily be

Further, and pursuant to the agreements between the parties, Omnitech voluntarily made itself available for purchase by Clorox under an option and right of first refusal, for which it was paid a valuable consideration—Clorox' corporate guaranty of a $2.5 million line of credit which, evidently, Omnitech needed desperately and which it was unlikely to obtain on the basis of its own credit. Although it chose to forego other suitors for a one-year period, Omnitech elected, in its business judgment, to take its chances with Clorox since Clorox had advantages over the other possible contenders, including immediate cash and the letter of credit guaranty.

Further the "restrictions" upon Omnitech of marketing only to the geographic and categoric areas in which it was already participating were quite reasonable, especially in light of the fact that Omnitech did not have the financial means to expand those markets without an investing partner. Finally, the charge that Clorox merely "used" Omnitech to educate itself about the insecticide category makes little sense in light of the fact that neither party knew Combat, or any other major competitor, would become available at the time the preliminary agreements were executed. Instead, the objective evidence reflects that Clorox' pursuit of Omnitech was genuine. In this regard, we note the undisputed testimony that it was "unusual" for Clorox to provide corporate guaranties on behalf of potential acquisition targets, even though Clorox enters into dozens of non-disclosure agreements of this type per year.

In sum, Omnitech is the disappointed potential target of a white knight, protesting a deal that fell apart before it was complete—a possibility that was anticipated by the express terms of the parties' interim agreements—but it is simply not the victim of any unfair trade practice as a matter of Louisiana law. Accordingly, we sustain Clorox' point of error in this regard.

### III. Conclusion

In light of the foregoing, we affirm that part of the district court's judgment granting Clorox' motion for judgment as a matter of law on Omnitech's trade secrets, breach of contract, detrimental reliance, and breach of fiduciary duty causes of action. We reverse the court's judgment denying Clorox' motion for judgment as a matter of law on Omnitech's LUTPA claim, vacate the award of

---

acquired in the Shulton purchase—and Dr. X.

damages, attorneys' fees, and costs in favor of Omnitech, and render judgment in favor of Clorox on this claim.

In light of our treatment of the foregoing points of error, we need not address the additional issues raised by the parties regarding (i) the reasonableness of, and sufficiency of evidence to support, the jury's verdict, (ii) the reasonableness of Omnitech's award of attorneys' fees, (iii) the exclusion of a portion of expert testimony with respect to one of Omnitech's theories of damages, and (iv) the denial of the parties' motions for new trial. Omnitech shall bear the costs of this appeal.

AFFIRMED in part, REVERSED and RENDERED in part.