**WRIGHT CHEMICAL CORP.**

v.

**William Bruce JOHNSON, et al.**

**Civ. A. No. 83–0145–A.**

United States District Court,
M.D. Louisiana.

April 29, 1983.

Michael D. Hunt, Breazeale, Sachse & Wilson, Baton Rouge, La., for plaintiff.

---

Howard E. Sinor, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

This diversity action is before the court upon plaintiff's motion for a preliminary injunction. A temporary restraining order was previously issued by the court.

### FINDINGS OF FACT

1. The individual defendants, William Bruce Johnson, Peter D. Cardillo and Rudy Thorgeson were formerly employed by plaintiff, Wright Chemical Corporation ("Wright") and by Zimmite Corporation, ("Zimmite"), whose water treatment business, including "all processes, know-how, formulae and trade secrets" was purchased by Wright on October 31, 1982.

2. Wright is and Zimmite was engaged in the sale of water chemical treatments and related services to industrial users.

3. In November, 1969, Johnson became employed by W.E. Zimmie, Inc., a predecessor corporation to Zimmite.

4. Johnson had experience in the water treatment industry prior to his employment by Zimmite, as he had been employed by Betz Laboratories from 1966 to 1969.

5. At the time of the Wright acquisition, Johnson was district manager of the Louisiana district, in which he was responsible for the sales, service and supervision of water treatment programs to customers of Zimmite in Louisiana.

6. Cardillo became employed by Zimmite on August 1, 1976, and at the time of the acquisition by Wright, held the position of area manager.

7. Cardillo had experience in the water treatment industry prior to his employment by Zimmite as he had been employed by Calgon for eighteen years and by Gardiniere for two years.

8. Thorgeson was employed by Zimmite on October 15, 1979, as a sales representative, the position which he held at the time of the Wright acquisition.

9. Johnson, Cardillo and Thorgeson all signed confidentiality agreements with their employer under the terms of which they agreed not to divulge to anyone else trade secrets and other confidential information acquired during the term of their employment.

10. Steven Shell ("Shell") is the president and sole shareholder of defendant, Bell Chemical Company, Inc., which was formed in 1979.

11. Shell was employed by Zimmite from 1976 to 1979 where he held the position of sales representative and later, area manager for the state of Tennessee.

12. From 1979 to 1982, Bell operated in Tennessee and Michigan, but not in Louisiana.

13. In March, 1982, Bell contacted Maverick Chemical Products concerning the blending of water treatment chemicals to be sold by Bell in Louisiana through GHR Energy Corporation. At that time, Bell had no sales representatives in Louisiana.

14. Shell contacted Johnson about being the Louisiana representative for Bell in August, 1982, but Johnson declined.

15. Shell wrote to Johnson on November 2, 1982, and on November 16, 1982, again offering the employment with Bell.

16. Johnson refused the offers of employment by Bell at that time.

17. On October 31, 1982, Wright acquired the assets of Zimmite.

18. The Wright-Zimmite purchase agreement provided that all Zimmite employees were terminated as of October 31, 1982.

19. On November 1, 1982, Wright offered new employment to certain Zimmite employees, including defendants, Johnson, Cardillo and Thorgeson, which offers were accepted by them.

20. Johnson, Cardillo and Thorgeson did not sign new confidentiality agreements with Wright.

21. A number of former Zimmite sales personnel in the Baton Rouge office, including Johnson, Cardillo and Thorgeson, were dissatisfied with what they perceived to be a reduction in compensation and benefits offered by Wright.

22. During their employment with Zimmite and Wright, defendants Johnson, Cardillo and Thorgeson did not have access to specific chemical formulae.

23. Defendants, Johnson, Cardillo and Thorgeson were each issued a "Zimm-Facts" book which contained general information about company products and other material, including pricing information; the pricing information was specifically marked "Do not Duplicate" or otherwise indicated as being confidential.

24. Defendants, Johnson, Cardillo and Thorgeson were aware of the fact that the "Zimm-Facts" book contained confidential information, although none could recall having signed form agreements prepared by the company relative to confidentiality.

25. During their employment with Zimmite and Wright, defendants, Johnson, Cardillo and Thorgeson did gain general knowledge of product data, price information and specific customer requirements.

26. Zimmite and Wright each took steps to maintain the secrecy of the precise chemical formulae found in its various products; the precise formulae were retained by the head of the laboratory and were maintained on a confidential basis.

27. Johnson resigned from Wright on November 30, 1982, and became employed by Bell in December, 1982.

28. Defendants Cardillo and Thorgeson made inquiry of Johnson concerning employment by Bell; they were offered employment on or about December 15, 1982, accepted that same date and resigned from Wright on December 15, 1982, effective December 17, 1982.

29. In December, 1982, Shell created two new Bell chemical products for the express purpose of closely competing with Zimmite chemical products in the Louisiana market.

30. Shell performed chemical analysis of ZC362 and ZD208, Zimmite's products in December, 1982, and attempted to make, through reverse engineering, the Bell formulae identical to the Zimmite.

31. The formula for Bell chemical product 2326 which competes with the Zimmite product ZC362, is different from the Zimmite formula. There are not only differences in ingredients; there are also differences in quantities of those ingredients which are the same in both products.

32. The formula for Bell product 2208 which was created to compete with Zimmite product ZD208 is different from the formula used by Zimmite.

33. None of the ingredients used in the Zimmite products ZC362 or ZD208 are secret or exclusive to Wright; similarly, all are chemicals of which the public is aware and they can be purchased from numerous chemical suppliers.

34. After December 17, 1982, Bell, through defendants Johnson, Cardillo and Thorgeson began soliciting potential customers for Bell in the Baton Rouge area.

35. These customers had been doing business with Zimmite.

36. Some of the Bell solicitation letters which were sent to customers in December, 1982, and January, 1983, represented that the Bell products were "identical" to competing Zimmite products which the customers were then using.

37. Those representations were not true; none of the Bell products are "identical" to competing Zimmite products, although the competing products contained some of the same ingredients.

38. Upon instructions from Bell, Maverick blended a 2,000 gallon batch of Bell Chemical which was delivered to BSAF Wyandotte in Geismar, Louisiana, on or about January 21, 1983.

39. The Bell product, BC2326, was pumped into Wyandotte's bulk storage tank which still contained approximately 150 gallons of the Wright product, ZC362.

40. The Bell product delivered to Wyandotte were straw-yellow in color.

41. At some date after January 21, 1983, an employee of Wright obtained a sample of the material from the Wyandotte bulk storage tank which was forwarded to Ms. Akin of Wright for analysis.

42. The sample analyzed was not straw-yellow in color, as was the Bell product delivered to BSAF Wyandotte, but was reddish-brown in color, which is the same as the Zimmite product, ZC362.

43. The only testimony indicating that Bell received information concerning Zimmite's formula is that of the Wright chemist, Akin, whose opinion was that the products are so close and reverse engineering is so difficult that it is unlikely that Bell by reverse engineering could have determined the actual contents of the Zimmite formula.

44. The sample utilized by Zimmite was contaminated in that it came from a tank which contained not only the Bell product but also a residue, 150 gallons of the Zimmite product, and Ms. Akin concedes that the contaminated sample would change the results of the chemical analysis.

45. Plaintiff has failed to prove that any of the defendants imparted any confidential formulae to Bell representatives.

## CONCLUSIONS OF LAW

1. Count One of the complaint alleges infringement of patents obtained by Zimmite and now owned by Wright and jurisdiction is vested in this court by 35 U.S.C. §§ 271 & 281.

2. Count Two of the complaint alleges a diversity claim of misappropriation of trade secrets in violation of the Louisiana statute, La.R.S. 51:1431 et seq. Since there is complete diversity of citizenship between the parties, this court has jurisdiction under 28 U.S.C. § 1332.

3. Count Three of the complaint alleges a diversity of citizenship claim of unfair competition and breach of fiduciary duties by the three former Zimmite employees.

4. No injunctive relief was requested under Counts One or Count Three; consequently, these matters were not taken up on the motion for preliminary injunction.

The only issue before the court is whether plaintiff is entitled to a preliminary injunction relative to use of confidential trade secrets.

5. By Act 462 of 1981, Louisiana adopted the Uniform Trade Secrets Act and La. R.S. 51:1432 specifically authorizes injunctive relief.

6. In order to establish a right to a preliminary injunction, a plaintiff must demonstrate:

1) A substantial likelihood of success on the merits;

2) That plaintiff will suffer irreparable injury unless the injunction issues;

3) That the threatened injury outweighs the damage the injunction may cause the opposing parties; and

4) If the injunction issues, the public interest will not be disserved.

*Vision Center v. Opticks, Inc.*, 596 F.2d 111 (5th Cir.1979) cert. denied 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980); *Canal Authority of Florida v. Callaway*, 489 F.2d 567 (5th Cir.1974).

7. Under Section 1431(4), a trade secret is defined as:

"Information, including a formulae, pattern, compilation, program, device, method, technique, or process, that:

(a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

8. Zimmite's chemical formulae for its various products are not generally known to and readily ascertainable by proper means by other persons and they were the subject of efforts that were reasonable under the circumstances to maintain secrecy. They are, therefore, "trade secrets" within the meaning of the statute. See generally *Standard Brands v. Zumpe*, 264 F.Supp. 254 (E.D.La.1967); *Lamb v. Quality Inspection*, 398 So.2d 643 (La.App. 3d Cir. 1981).

9. The problem, however, is not that they are not trade secrets, but that plaintiff has not demonstrated that any of the three former Zimmite employees have actually disseminated the information. As a matter of fact, the court has found that they did not have the precise chemical formulae and therefore could not communicate it. cf. *Zumpe, supra.*

10. Regarding the general ingredients of the products, the court finds that most of the chemical ingredients used in water treatment products are well known to persons in the industry, the secrecy usually being in solutions utilized and various combinations of ingredients. See, *Lamb, supra.*

11. Shell may have been lucky in his chemical analysis of the Zimmite products but, based on his prior experience in the field, he apparently made a shrewd guess, knowing the results of the products, as to what their contents were. Even so, as noted, the Bell products that compete with the Zimmite products are not precisely the same, either in ingredients or quantities of ingredients. Furthermore, even if Shell's test results had enabled him to duplicate the exact formula, under the Act such acquisition of the formulas should not be considered "misappropriation." Comment (a)(2) to La.R.S. 51:1431 provides: "Discovery by 'reverse engineering', that is, by starting with the known product and working backward to find the method by which it was developed" is a proper means of gaining access to protected information.

12. Plaintiff, thus, is not entitled to a preliminary injunction relative to the Zimmite chemical formulae.

13. Plaintiff has not proved that the defendants have utilized any of the confidential pricing information communicated to them. The information contained in the "Zimm-Facts" book is certainly entitled to protection as a trade secret, cf. *National Oil Service of Louisiana v. Brown,* 381 So.2d 1269 (La.App. 4th Cir.1980) (customer lists may be trade secrets), and if the three former Zimmite employees have copied such information and have made any attempt to utilize such information, plain-tiff would be entitled to a preliminary injunction. There was testimony that Johnson had copied at least some of the pricing pages. Johnson has denied it and has produced no such documents in response to plaintiff's motion for production of documents. Plaintiff has not borne its burden of persuasion on this issue and has not demonstrated that it is likely to prevail on the merits.

For the foregoing reasons, the court finds that it is not appropriate that a preliminary injunction issue. The temporary restraining order previously issued herein is hereby cancelled and set aside. All other issues shall await trial upon the merits.